**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| W.P.V., on his own behalf and on behalf of his minor child, W.P.O., <br><br> Plaintiff, <br><br> v. <br><br> United States of America, Cayuga Home for Children, Inc. d/b/a Cayuga Centers <br><br> Defendant. | C.A. No.: <br><br><br> **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

### I.  INTRODUCTION

1.     Long before border walls, Emma Lazarus penned a message that has been enshrined on the Statute of Liberty for more than 100 years: "Give me your tired, your poor, your huddled masses yearning to breathe free. . . . The wretched refuse of your teeming shore. Send these, the homeless, tempest-tost to me, I lift my lamp beside the golden door!" These words greeted immigrants at the Ellis Island immigration center—a welcoming message to all who approached.

2.     Despite this public proclamation, the United States government instituted a policy to forcibly separate children from their parents and discourage immigration.

3.     This policy of family separation at the hands of the United States government has caused extraordinary trauma to thousands of families, including Plaintiffs – a father and his child who was only about four years old at the time of separation. The government designed this policy to inflict emotional distress on families like the plaintiffs to deter parents and children from immigrating to this country.

4.      Executive branch officials in the Trump administration intended to use the trauma resulting from family separations, and media reporting of that trauma, to deter future immigrants and asylum-seekers. Federal officials at the highest levels repeatedly made public statements acknowledging the intent of the family separation policy. For example, then-President Donald J. Trump defended the policy when he tweeted: "[I]f you don't separate, FAR more people will come."[1]

5.      The government has admitted that it has separated at least 3,800 children from their parents or guardians after they crossed the southwestern U.S. border,[2] although Government reporting indicates that the total number of separated families is likely much higher.[3]

6.      After separating children from their parents, the government inflicted further trauma when it delayed providing information to parents and children of each other's whereabouts or well-being, failed to facilitate adequate communication between the parents and children during

---

[1] Ex. 1, Steve Benen, Trump points to renewed interest in family separations at the border: The president's tweet on family separations was effectively a defense of a policy Trump claims he ended months ago., MSNBC (Dec. 17, 2018, 11:31 AM CST), https://www.msnbc.com/rachel-maddow-show/trump-points-to-renewed-interest-family-separations-the-border-msna1175841;   see also Ex. 2, Kimberly Kindy et al., Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings, WASH. POST (Apr. 28, 2019), https://www.washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5_story.html.

[2] Ex. 3, Joint Status Report at 1, 10, Ms. L. v. U.S. Immigration and Customs Enf't, No. 18-cv-00428 DMS MDD (S.D. Cal. Sept. 9, 2019), ECF No. 465 (the government acknowledged that, for the original class, as many as 2,814 children were separated from their parents, and has so far acknowledged an additional 986 children as part of the expanded class); see also Ex. 4, OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-BL-18-00511, SEPARATED CHILDREN PLACED IN OFFICE OF REFUGEE RESETTLEMENT CARE 11 (Jan. 17, 2019) [hereinafter HHS OIG REPORT I], available at https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf (last visited Feb. 17, 2021).

[3] See Ex. 4, HHS OIG REPORT I, supra note 2, at 1, 6, 13 (reporting that "thousands of children may have been separated . . . before the accounting required by the Court [in Ms. L.]").

their separation, and failed to implement any system for tracking the children to ensure that the families could be reunited.

7.     The Plaintiffs, WPV and WPO, in this action fell victim to the federal government's family separation policy in May 2018, when federal officers forcibly separated this father (WPV) from his son (WPO) while they were detained at the border. While WPV was moved throughout unidentified facilities near the border, WPO was shipped to Cayuga Home for Children, Inc. d/b/a Cayuga Centers (hereinafter, "Cayuga Centers")—a facility that has built a multimillion dollar business model by housing separated children far from the reach of their parents.  Throughout their months-long detention, the government provided only limited information to WPV about his son's whereabouts and well-being and offered only minimal opportunities for WPV to communicate with his son.

8.     WPV was sent back to Honduras, leaving WPO in the United States.  Almost three years later, WPO and WPV remain separated.  Because of the government's actions, Plaintiffs suffered, and continue to suffer, substantial and ongoing trauma.

9.     The government's family separation policy was cruel and inhuman, and it is unlawful. The United States is liable for the conduct which harmed Plaintiffs under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, et seq. ("FTCA").  The Cayuga Centers is also liable for the conduct that harmed WPO under the Rehabilitation Act, 29 U.S.C. § 794 and 42 U.S.C. § 12102(1) ("Rehab Act").

10.     Plaintiffs bring this action under the FTCA and Rehabilitation Act, seeking compensation for the extraordinary harms they suffered at the hands of the federal government and the Cayuga Center.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346(b) and 28 U.S.C. § 1367.

12.     On April 30, 2020, Plaintiff WPV submitted administrative claims to the U.S. Department of Homeland Security ("DHS"), the U.S. Department of Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), and the U.S. Department of Health and Human Services ("HHS"). None of these agencies has made a final disposition of any of Plaintiff WPV's administrative claim and, as six months have passed since Plaintiff WPV's submission of the claims, they are deemed finally denied. 28 U.S.C. § 2675(a). Accordingly, Plaintiff WPV has exhausted all potential administrative remedies.

13.     On April 30, 2020, Plaintiff WPO submitted administrative claims to the U.S. Department of Homeland Security ("DHS"), the U.S. Department of Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), and the U.S. Department of Health and Human Services ("HHS"). None of these agencies has made a final disposition of any of Plaintiff WPO's administrative claim and, as six months have passed since Plaintiff WPO's submission of the claims, they are deemed finally denied. 28 U.S.C. § 2675(a). Accordingly, Plaintiff WPO has exhausted all potential administrative remedies.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1402(b) as a substantial portion of the acts and omissions that are the subject of this Complaint occurred in this District.

### III.      PARTIES

15.      Plaintiffs WPV and WPO bring this case against Defendants United States of America and Cayuga Home for Children, Inc.

#### A.      The Plaintiffs

16.      Plaintiff WPV is the father of Plaintiff WPO.

17.      WPO, now 7 years old, was four years old at the time that WPV and WPO began a journey that ultimately resulted in the forced separation described in this Complaint.

18.      WPV and WPO are nationals of Honduras.

19.      WPO currently resides in Dallas, TX with his relatives.

20.      WPV currently resides in Honduras.

#### B.      The Defendants

21.      Defendant United States of America ("United States") is the appropriate defendant under the FTCA. 28 U.S.C. §§ 1346(b), 2671, *et seq.*

22.      All federal officers referenced in this Complaint were at all relevant times employees of the United States or working at the instruction or direction of employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, DHS, ICE, CBP, USCIS, and HHS.

23.      One or more employees of the United States (as referenced in paragraph 20) were responsible for separating WPV from his son, WPO.

24.      One or more employees of the United States (as referenced in paragraph 20) employees were also responsible for supervising and managing detained individuals at CBP and ICE facilities, including at least those located in Texas and New Mexico where WPV was detained during the course of his separation from WPO.

5

25.     One or more employees of the United States (as referenced in paragraph 20) were responsible for supervising and managing the detention of children the government classifies as unaccompanied, including at facilities in New York, where WPO was detained while separated from his father.

26.     At all relevant times, all employees and/or officers of DHS, ICE, CBP, CIS, and HHS, who are referenced in this Complaint and interacted with Plaintiffs, were acting as investigative or law enforcement officers. 28 U.S.C. § 2680(h).

27.     Defendant Cayuga Home for Children, Inc. ("Cayuga Centers") is an organization located in New York that contracts with the federal government to house "unaccompanied" children.  Cayuga Centers receives federal funding for its role in "the Unaccompanied Childrens' (UC) Program" which is "operated under contract with the Federal Office of Refugee Resettlement (ORR)."[4]

28.     One or more employees of the Cayuga Centers were responsible for supervising and managing the detention of children the government classifies as unaccompanied, including at facilities in New York, where WPO was detained while separated from his father.

IV.     **STATEMENT OF FACTS**

A.     **The US Government Developed and Implemented the Family Separation Policy to Deter People from Seeking Asylum in the United States**

29.     Curbing the number of individuals seeking asylum in the United States was a central focus of the Trump Administration's immigration policy.[5]

---

[4] *See* Ex. 5, Cayuga Home for Children Inc. IRS Form 990 for tax year ending June 30, 2018; *see also* Ex. 6, Cayuga Home for Children Inc. IRS Form 990 for tax year ending June 30, 2019.

[5] *See, e.g.,* Ex. 7, U.S. Judge Bars Trump Administration From Enforcing Asylum Ban, CNBC, Nov.   20,   2018,   https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-

30.     To that end, in July 2017, the government established a family separation pilot program in CBP's El Paso sector, through which it targeted for criminal prosecution parents who crossed the border with children.[6] CBP detained the parents and forcibly took their children away from them, designated the children as unaccompanied minors (despite their arriving with their parents), and placed the children in the custody of the Office of Refugee Resettlement ("ORR"), a component of HHS. Through this initiative, the government separated 281 individuals in families between July and November 2017.[7]

31.     In December 2017, a month after the pilot program ended, senior officials at the Department of Justice and DHS exchanged a memorandum titled "Policy Options to Respond to

---

enforcing-trump-asylum-ban.html?__source=sharebar|email&par=sharebar; *see also* Ex. 8, Shaw Drake & Edgar Saldivar, Trump Administration Is Illegally Turning Away Asylum Seekers, ACLU (Oct. 30, 2018), https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers; *see also* Ex. 9 Nick Miroff & Josh Dawsey, The Advisor Who Scripts Trump's Immigration Policy, WASH. POST (Aug. 17, 2019), https://www.washingtonpost.com/graphics/2019/politics/stephen-miller-trump-immigration; *see also* Ex. 10 Emma Platoff et al., While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum, TEXAS TRIBUNE (July 10, 2018), https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/; *see also* Ex. 11, Maria Sacchetti et al., Trump Tightens Asylum Rules, Will Make Immigrants Pay Fees to Seek Humanitarian Refuge, WASH. POST (Apr. 29, 2019), https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum-cases/2019/04/29/df41b5f2-6adb-11e9-be3a-33217240a539_story.html; *see also* Ex. 12, Glenn Thrush, U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border, N.Y. TIMES (Jan. 24, 2019), https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html; Ex. 13, Yeganeh Torbati & Kristina Cooke, Trump Administration Moves to Curb Migrants' Asylum Claims, REUTERS (Nov. 8, 2018), https://www.reuters.com/article/us-usa-immigrationasylum/trump-administration-moves-to-curb-migrants-asylum-claimsidUSKCN1ND35K.

[6] Ex. 4, HHS OIG REPORT I, *supra* note 2, at 3.

[7] *Id.*

Border Surge of Illegal Immigration."[8] Two of the policies outlined in the memorandum were titled: "Increased Prosecution of Family Unit Parents" and "Separate Family Units."

32.     Under the "Increased Prosecution of Family Unit Parents" policy, the memorandum stated that "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in HHS custody as [unaccompanied alien children]." Similarly, according to the memorandum, the separation policy would call for an announcement that adults would be placed in adult detention while children would be placed in HHS custody.[9] The memorandum further stated that "the increase in prosecutions would be reported by media and it would have substantial deterrent effect."[10]

33.     On April 6, 2018, then-President Trump issued a memorandum entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement."[11] The memorandum, among other things, directed the Secretary of Homeland Security, the Secretary of Defense, the Attorney General, and the Secretary of Health

---

[8] Ex. 14, Policy Options to Respond to Border Surge of Illegal Immigration, (Dec. 16, 2017), https://www.documentcloud.org/documents/5688664-Merkleydocs2.html (hereinafter "Policy Options"); *see also* Ex. 15, Julia Ainsley, Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children, NBC NEWS (Jan. 17, 2019), https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targetingmigrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the office of Senator Jeff Merkley).

[9] Ex. 14, Policy Options, *supra* note 8.

[10] *See id.*

[11] Ex. 16, 83 Fed. Reg. 16,179 (Apr. 6, 2018), available at https://www.federalregister.gov/d/2018-07962.

and Human Services to submit a report to the President detailing measures that their respective departments had pursued or were pursuing to end "'catch and release' practices."[12]

34.     "Catch and Release" is a simplified, misleading term that refers to a federal practice that various administrations have implemented allowing asylum-seekers, among other groups of immigrants, to live in the community, rather than be held in government custody, while awaiting their immigration hearings.[13] This practice is fully in accord with immigration law.

35.     On the same day that then-President Trump issued the memorandum entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement," then-Attorney General Jeff Sessions announced that the government would institute a "Zero Tolerance" policy.[14]

36.     The Zero Tolerance policy mandated the prosecution of all persons who crossed the United States border between ports of entry, thereby extending to the entire southern border the practices of criminal prosecution and family separation previously tested in the El Paso pilot program.[15]

37.     Consistent with these announcements, the Trump Administration promptly began separating families along the entire border.

---

[12] *Id.*

[13] Ex. 17, Katie Benner & Charlie Savage, <u>Due Process for Undocumented Immigrants, Explained</u>, N.Y. TIMES (June 25, 2018), https://www.nytimes.com/2018/06/25/us/politics/due-process-undocumented-immigrants.html.

[14] Ex. 18, Attorney General Announces Zero Tolerance Policy for Criminal Illegal Entry, DEP'T OF JUSTICE (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[15] *See id.*

38.     The purpose of the Zero Tolerance policy was to deter individuals from seeking asylum or otherwise coming to the United States.[16]  The Trump Administration intended to deter immigration by harming families through the forcible separation of parents and children.[17]

39.     Officials at all levels of the Trump Administration knew that separation would cause enormous trauma to the children and parents. For example:

- In September 2016, the DHS Advisory Committee on Family Residential Centers issued a report that concluded that "[t]he best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS," and warned that "separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children."[18]

- Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, starting in February 2017, he repeatedly warned those devising the policy that separating children from their parents would likely harm the children, including "significant potential for traumatic psychological injury to the child."[19]

- In March 2017, several DHS officials told the press that the department was considering a policy of separating mothers and children who cross the border illegally in order to deter

---

[16] *See* Chaos on the Border, Robots to the Rescue, To Kill a Mockingbird, CBS NEWS (Nov. 25, 2018),        https://www.cbsnews.com/video/chaos-on-the-border-robots-to-the-rescue-to-kill-a-mockingbird/ (revealing an un-redacted copy of the memo implementing the "Zero Tolerance" policy that stated that the policy's purpose was deterrence); *see also* Ex. 14, Policy Options, *supra* note 7.

[17] *See supra* note 1.

[18] Ex. 19, U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REP. OF THE DHS ADVISORY   COMMITTEE   ON   FAMILY   RESIDENTIAL   CENTERS   2   (2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[19] Ex. 20, Jeremy Stahl, The Trump Administration Was Warned Separation Would Be Horrific for   Children,   Did   It   Anyway,   SLATE   (July   31,   2018),   https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html; *see also* Ex. 21, Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White),   https://energycommerce.house.gov/committee-activity/hearings/hearing-on-examining-the-failures-of-the-trump-administration-s-inhumane.

families from migrating to the United States.[20]  The day after the press report, the American Academy of Pediatrics responded with a statement opposing DHS's proposed family separation program, warning that:

> Federal authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers.[21]

40.      Moreover, it is well established that forcibly separating families causes severe harm to children. Scientific and medical evidence shows that the trauma caused by separating a child from his or her parent is likely to have extraordinarily harmful and long-lasting effects on the child's development, including permanent emotional and behavioral problems and brain damage.[22]

---

[20] Ex. 22, Julia Edwards Ainsley, Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border, REUTERS (Mar. 3, 2017), https://www.reuters.com/article/us-usa-immigration-children-idUSKBN16A2ES.

[21] Ex. 23, Samantha Schmidt, DHS is considering separating mothers and children who cross the border illegally, WASH. POST (Mar. 7, 2017), https://www.washingtonpost.com/news/morning-mix/wp/2017/03/07/dhs-is-considering-separating-mothers-and-children-who-cross-the-border-illegally/.

[22] See, e.g., Ex. 24, Allison Abrams, Damage of Separating Families: The Psychological Effects on Children, PSYCHOL. TODAY (June 22, 2018), https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-separating-families (Children who are separated from a parent "develop insecure/disorganized attachment and persisting high levels of stress."); id. ("[T]he effects of mother-child separation on children's aggressive behavior are early and persistent."); see also Ex. 25, Sarah Reinstein, Family Separations and the Intergenerational Transmission of Trauma, CLINICAL PSYCHIATRY NEWS (July 9, 2018), https://www.mdedge.com/psychiatry/article/169747/depression/familyseparations-and-intergenerational-transmission-trauma ("[C]hildhood trauma is associated with emotional dysregulation, aggression against self and others, difficulties in attention and dissociation, medical problems, and difficulty with navigating adult interpersonal relationships."); see also Ex. 26, Jeremy Raff, "The Separation Was So Long. My Son Has Changed So Much.": U.S. Border Guards Took a 6-Year-Old Honduran Boy from His Mother, and Ultimately Returned a Deeply Traumatized Child, THE ATLANTIC (Sept. 7, 2018), https://www.theatlantic.com/politics/archive/2018/09/trump-family-separationchildren-border/569584/ ("The trauma of separation 'can disrupt the architecture of a child's brain[.]' . . . Prolonged separation weaponizes a child's fight-or-flight response, elongating it into toxic stress that can damage health in both the short and long term[.]"); Ex. 27, Olga Khazan, Separating Kids

41.     Despite being aware of the severe harm caused by separating families, Trump Administration officials at the highest levels planned and implemented the policy of separating families.[23]  For example:

- Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, starting in February 2017, he repeatedly warned those devising the policy that separating children from their parents would likely harm the children, including "significant potential for traumatic psychological injury to the child."[24] Administration officials ignored Commander White's warnings up through the day he left ORR (on March 15, 2018), just weeks before the policy was launched across the entire southern border, and continued to disregard his warnings thereafter.

42.     Indeed, officials in the Trump Administration, including then-President Trump, intended that the trauma suffered by asylum seekers at the hands of the family separation policy and the publicity surrounding it, would deter future asylum seekers from seeking refuge in the United States for fear of suffering the same fate. For example:

- When asked about the policy by NPR on May 11, 2018, John Kelly, President Trump's then-Chief of Staff, responded that "a big name of the game is deterrence. . . . It could be

_____

From Their Families Can Permanently Damage Their Brains: A Pediatrician Explains How the Trauma of Family Separation Can Change Biology, THE ATLANTIC (June 22, 2018), https://www.theatlantic.com/health/archive/2018/06/how-the-stress-of-separationaffects-immigrant-kids-brains/563468/ (Separating a child from his or her parents "can permanently affect . . . children's brains, especially if it occurs early in childhood. . . . Studies show that high levels of cortisol[, a stress hormone induced by separation] . . . can suppress the immune system and change the architecture of a developing brain[.] . . . Another stress chemical, corticotropin-releasing hormone, can damage the hippocampus, which plays a major role in learning and memory.").

[23] Ex. 14, Policy Options, supra note 7; see also Ex. 28, Philip Bump, Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent, WASH. POST, June 19, 2018                    https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/.

[24] Ex. 20, Stahl supra note 19; see also Ex. 21, Examining the Failures, supra note 19.

a tough deterrent — would be a tough deterrent." As for the children affected, he said: "[t]he children will be taken care of — put into foster care or whatever."[25]

- On June 18, 2018, on Fox News's "The Ingraham Angle," host Laura Ingraham asked then-Attorney General Jeff Sessions, "is this policy in part used as a deterrent? Are you trying to deter people from bringing children or minors across this dangerous journey? Is that part of what the separation is about?" Sessions replied, "I see that the fact that no one was being prosecuted for this as a factor in a five-fold increase in four years in this kind of illegal immigration. So yes, hopefully people will get the message and come through the border at the port of entry and not break across the border unlawfully."[26]

- On June 19, 2018, Steven Wagner, Assistant Secretary of HHS, told reporters that "[w]e expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[27]

- Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, starting in February 2017, he repeatedly warned those devising the policy that separating children from their parents would likely harm the children, including "significant potential for traumatic psychological injury to the child."[28] Administration officials ignored Commander White's warnings up through the day he left ORR (on March 15, 2018), just weeks before the policy was launched across the entire southern border, and continued to disregard his warnings thereafter.

43.    Accordingly, from 2017 through the time period at issue in this Complaint, senior government officials made the express choice to intentionally cause parents and children, including very small children, extraordinary pain and suffering in order to accomplish their policy objectives, which include deterring parents and children from seeking asylum. To seek asylum is a universal

---

[25] *See* Ex. 29, Christina Wilkie, <u>White House Denies Separating Families Is "Policy," but Insists It Is Needed "to Protect Children,"</u> CNBC (June 18, 2018), https://www.cnbc.com/2018/06/18/white-house-denies-separating-families-is-policy.html; *see also* Ex. 30, <u>The Way Forward on Border Security: Hearing Before the H. Comm. On Homeland Sec.,</u> 116th Cong. 46-47, 48 (Mar. 6, 2019) (statement of Sec'y Kristjen Nielsen, Dep't of Homeland Sec.).

[26] *Sessions defends zero tolerance immigration policy*, FOX NEWS (June 18, 2018), https://video.foxnews.com/v/5779065216001/#sp=show-clips.

[27] Ex. 28, Bump, *supra* note 23.

[28] Ex. 20, Stahl *supra* note 19; *see also* Ex. 21, <u>Examining the Failures</u>, *supra* note 19.

human right dating to the 1951 United Nations Refugee Convention enacted to prevent a repeat of the horrors visited upon refugees who could not find sanctuary from persecution and slaughter during World War II.

44.     The government's policy of separating children was a mandatory policy that, as implemented, required CBP and ICE agents to separate parents from their children after crossing the border, even if the parents were not targeted for prosecution—the Trump Administration's pretext for separation and deterrence—as was the case with Plaintiffs.

**B.      Consistent with the Family Separation Policy, the Government Forcibly Separated WPV and WPO**

45.     WPV and WPO traveled to the United States to escape unsafe conditions in Honduras.  But upon entering the United States, the two were taken into custody, placed in an overcrowded and unsanitary detention facility, and then cruelly separated.  Both have since been released from detention, but the impact of the forced separation remains—as WPV and WPO remain separated to this day.

**1.      WPV and WPO Travel to the United States**

46.     In search of a better life, around April 2018, WPV started a journey from Honduras to the United States with his then four-year-old son, WPO.

47.     WPV's plan from the outset was to seek asylum in the United States.

48.     In an effort to draw little or no attention that they were leaving Honduras, WPV and WPO took only a limited number of belongings with them.

49.     The journey from Honduras to the United States was long and arduous.  WPV estimates that they began sometime in April 2018 and spent approximately one month in transit. The trip was mostly by bus.  Many of the roads were dangerous. The limited number of belongings

that WPV and WPO brought with them were stolen during the journey.  Yet WPV was willing to take this risk, given the unsafe conditions in Honduras.

50.     During the travel, WPO fell ill.  The four-year-old had an upset stomach, developed diarrhea and as a result, soiled his clothes.  WPV took off WPO's soiled clothes to keep him from further illness and discomfort.  As a result, WPO wore only a diaper for the rest of the journey.

### 2.     WPV and WPO Enter the United States

51.     On or about May 2018, WPV and WPO approached the border near El Paso, Texas.

52.     Upon crossing the border, WPV saw a group of officers underneath a bridge.  WPV and WPO approached the officers to surrender themselves—which was their plan from the outset.

53.     Upon surrendering, WPV told the officers that his son WPO was sick and requested medical attention for his son. The officers ignored WPV's request for medical attention for WPO. No medical attention was provided to WPO until several hours later.

54.     The officers detained WPV and WPO and as part of that process, the officers restrained WPV at the hands and feet.

55.     The officers placed WPV and WPO into a patrol car and drove them to a local office. While transporting WPV and WPO to the local office, the officers repeatedly used derogatory phrases to refer to WPV and exhibited racist behavior—all in front of WPO.

56.     At the local office, WPV again informed the officers that WPO was sick and asked for medical assistance.  WPO was still wearing only a diaper. Again, the officers did not respond to WPV nor did they render any aid to WPO.

57.     The officers interviewed WPV at the local office.  WPV informed the officers that he was scared to return to Honduras because of the dangerous and harmful conditions of Honduras. One of the officers was particularly aggressive during the interview.  He called WPV a "thief" and

a "criminal."  He accused WPV of entering the United States to commit crimes and swore at him.
The interview lasted approximately 5 minutes.

58.    Throughout this time, no one attended to WPO or provided him with medication or
clothes, despite continued requests from WPV.

59.    After the interview, the officers led WPV and WPO to a room that is referred to by
asylum-seekers as a "*hielera*" ("icebox," in Spanish) because of its very cold temperatures, lack
of windows and natural light, and all-hard surfaces..

60.    These conditions of the *hielera* violate CBP's own internal policies and
standards[29]—yet the CPB uses these cold, crowded rooms to detain multiple asylum seekers at the
time.  Indeed, the CPB detained WPV and WPO in the *hielera* for several nights.

61.    While in the *hielera*, WPV tried to keep WPO warm with a small cloth he found in
the room but did not have anything to keep himself warm.

62.    Also, while in the *hielera*, WPV and WPO requested but were denied access to
water.

63.    WPO, who was still only wearing a diaper and was still sick, laid on the floor with
WPV.

---

[29] CBP issued the National Standards on Transport, Escort, Detention and Search (TEDS) in
October of 2015, and CBP officers were required to abide by these standards during the period of
plaintiffs' separation and detention. *See* Ex. 31, National Standards on Transport, Escort,
Detention, and Search 2015 [Hereinafter TEDS], Customs and Border Protection,
https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-
search. Section 4.6 of TEDS "Hold Room Standards" states "When it is within CBP control,
officers/agents should maintain hold room temperature within a reasonable and comfortable range
for both detainees and officers/agents. *Under no circumstances will officers/agents use
temperature controls in a punitive manner.*" TEDS at 16 (emphasis added). By subjecting plaintiffs
to freezing cold temperatures deliberately in the *hielera*, CBP officers violated this TEDS standard.

64.     WPV again requested clothes and medicine for WPO.  Another hour passed before a female officer took WPV and WPO to another room to give WPO medicine (one small pill).  The officer also gave WPO pants but did not give him shoes.

65.     WPV and WPO were at the local office approximately three hours before WPO received any medicine.  No officer or medical personnel ever examined WPO when WPV was with him in the *hielera*.

### 3.     WPV and WPO Were Separated by the United States

66.     After holding WPV and WPO in the *hielera* for about three hours, officers informed WPV that he was to be removed from the *hielera* and transported to federal prison because he had committed a crime by entering the United States.

67.     The officers then removed WPV from the icebox while WPO was sleeping in his father's arms.  WPO did not even know that his father had been removed from the room.

68.     The purpose of separating WPO from WPV and isolating him from any family, was to torment and traumatize the family, and to coerce WPV to give up any claims for relief and accept deportation. The torment and trauma were inflicted deliberately because of their race and national origin. The government's actions were directed at them because they were Latinos from the Central American country of Honduras, and it also served to deter families from Central American countries like Honduras from seeking asylum in the United States.

69.     WPV was distraught at the thought of being separated from his son.  WPV cried as he was being transported from the *hielera* to a federal prison.  The journey to the federal prison took approximately an hour and a half, during which time, the officers refused to provide WPV with any information about WPO or what was going to happen to him.

70.     WPV arrived at the federal prison facility, and shortly thereafter, he had his first court appearance at this facility.

71.     WPV did not have access to counsel during his detention.

72.     WPV was detained at this federal prison facility for six days.  During those six days, he was not provided any information about WPO.

73.     However, during his detention, WPV met someone who had been in the *hielera* with him.  This person told WPV that WPO had been left unattended for a prolonged period of time after the officers removed WPV.

74.     WPV remained overcome with grief, and he could hardly eat at the federal prison. He cried every day and had trouble sleeping.  He asked the officers about his son several times, but the officers refused to provide him any information.

75.     WPV was transported to various facilities in Texas and New Mexico while he was detained—at least five.  The facilities did not meet any reasonable standard for habitability. There were not enough sleeping arrangements or only a single public bathroom for a large number of detainees. Violent criminals and nonviolent detainees were housed together.  One of these violent criminals threatened WPV.

76.     WPV and WPO did not speak during the time in which both were detained.

77.     Throughout this lengthy process, the government never provided WPV with any explanation as to why he was being moved, nor was he provided any information about his son or any means to contact his son.

78.     Approximately one month after the separation, WPV spoke with his brother, APV, and told him about the separation.

79.     Only when WPV spoke to his brother (APV), more than one month after WPV was separated from WPO, was WPV first informed (by APV) that WPO had been released from custody.

80.     WPV was deported to Honduras on July 11, 2018.

**4.      WPO Was Kept Separated from His Father and His Family for over a Month**

81.     WPO stayed in the *hielera* after his father was removed and ultimately spent several weeks in the government's detention facilities.  But even after leaving those detention facilities, WPO remained forcibly separated from his families.

82.     On or about May 26, 2018, WPO was moved against his will to Cayuga Centers in Bronx, New York, thousands of miles away from his father.

83.     Cayuga Centers is a welfare agency that lauds itself as "making the world a better place for youth and families."[30]  Cayuga Centers purports to offer a program that places an emphasis on "keep[ing] families together."[31]

84.     Despite this, Cayuga Centers has built its business model on holding kids against the will of the families (such as WPO and WPV) in facilities throughout New York.

85.     For example, in 2018, when WPO was being detained at the Cayuga Center, more than 300 other children that had been separated at the border were being forced to stay in the Cayuga Center's New York City facilities.[32]

_____

[30] Ex. 32, Cayuga Centers Website, About Us, https://cayugacenters.org/about-us-cayugacenters/ (last visited April 1, 2021).

[31] Ex. 33, Cayuga Centers Website, Services, https://cayugacenters.org/services/#vulnerable (last visited April 1, 2021).

[32] Ex. 34, Liz Robbins, How One Agency Built a Multimillion-Dollar Business in Migrant Children, NEW YORK TIMES (July 31, 2018), https://www.nytimes.com/2018/07/31/nyregion/cayuga-centers-immigration-separated-children.html (last visited April 1, 2021); *see also* Ex. 35, Martha Mendoza & Larry Fenn, Detaining Immigrant Kids is Now a Billion-Dollar Industry, AP News (July 13, 2018), https://apnews.com/article/289b015df6e94ac6b2a35c28b11365b5 (last visited April 12, 2021).

86.    Since 2014, Cayuga Centers has received more than $100 million in contracts from the government for housing kids that were separated from their families at the border.  *Id.*  "It seems that Cayuga Centers has evolved into a business whose priority is making money as opposed to a family service that helps youth meet the challenges of life."  *Id.* (quoting Officer Joseph Villano, the president of police union in New York, in a 2017 statement to the board of trustees).

87.    At the time of WPO's detention, Cayuga Centers was the country's "largest provider of foster care homes for unaccompanied minors — migrant children who had come to the U.S. border alone."  *Id.*

88.    For example, in 2018, Cayuga Centers allocated more than $35 million in its budget to its Unaccompanied Childrens' Program, which operates "short-term foster care beds" and "long-term foster care beds for unaccompanied children who are in Federal Custody."[33]

89.    WPO was under the care of Cayuga Centers for approximately one month.

90.    During WPO's stay at Cayuga Centers in 2018, Cayuga Centers was not able to provide adequate facilities for the children in its care.  Further, Cayuga Centers failed to take account of the trauma WPO experienced fleeing Honduras and being separated from his father and instead exacerbated it. In fact, media reports indicate that because the Trump administration increased its efforts to separate immigrant children from their parents, an increasingly larger number of young kids was being detained at Cayuga Centers and as a result, there was insufficient medical staffing, teachers, and trainers for the detained kids.[34]

---

[33] *See supra* note 4.

[34] Rachel Maddow, Surreptitious video offers peek at impact of Trump border policy, MSNBC (June 25, 2018), https://www.msnbc.com/rachel-maddow/watch/surreptitious-video-offers-peek-at-impact-of-trump-border-policy-1263872579594 (last visited May 12, 2011).

91.     To avoid scrutiny, in and around the time that WPO was detained, it is documented that Cayuga Centers cautioned the kids in its care to not discuss their cases with the media, threatening that those that did would be denied further care at Cayuga Centers.[35]

92.     It is well known that families and children arriving in the United States from Central America are often severely emotionally traumatized by their experiences of persecution and violence in those countries, by their perilous journey to the United States, and by the abusive treatment at the hands of border and immigration officials once they arrive in this country.

93.     It is further well known that children who are subject to these conditions suffer from post-traumatic stress disorder, generalized anxiety, and depression.[36] Unless programs and detention conditions address these disabilities, traumatized children are prevented from taking advantage of basic services that are offered to unaccompanied children, such as the provision of a safe and non-traumatizing setting in which to sleep, play, learn, and develop.

94.     This was true of WPO. He fled his home under unsafe conditions, was abruptly and traumatically separated from his father in a strange and unfamiliar country, and was isolated and confined in the Cayuga Center's facilities.  In fact, instead of making an effort to reunite WPO with his father or even his extended family, WPO was placed in the custody of a foster family.

95.     The Cayuga Centers failed to take account of these traumatic experiences, thereby imposing on WPO a living situation that further traumatized him and inhibited his normal

---

[35] *Id.*

[36] *See* Ex. 36, <u>Letter to DHS and DOJ from 241 Organizations regarding Notification of disabilities of persons targeted in Central American refugee raids and request for immediate modifications</u>, Yale Law School (Jan. 11, 2016),
https://law.yale.edu/sites/default/files/area/clinic/document/dhs_doj_rehab_act_letter_-_2016.01.11_-_english.pdf (last visited May 14, 2021).

development and his ability to take advantage of the programming and services that the Cayuga
Centers offers to children in custody.

96.     On June 29, 2018, WPO was discharged from Cayuga Centers after being separated
from his father, in a foreign country, for over a month.

97.     Subsequently, WPO flew to Texas to live with APV.  Because WPO did not have
a previous relationship with APV, WPO's grandmother accompanied APV to the airport to greet
WPO.

98.     As expected, WPO was traumatized from the entire experience.  Prior to the
separation, WPO was a lively and talkative child.  After the separation, however, WPO rarely
speaks or expresses any emotion.  WPO has also been very fearful of showers.  WPO refuses to
eat American food and still prefers to eat Honduran food.

99.     Concerned for his welfare, WPO was taken by his extended family to a low-income
medical clinic, where the doctors determined that WPO was suffering from trauma.

100.    WPO has also seen a therapist at his elementary school.

101.    WPO has since also been diagnosed with an aggravated form of asthma.

**C.     The Government's Forcible Separation and Failed Reunification of
        WPV and WPO Were Part of Its Pattern and Practice of Intentional
        Mistreatment of Similarly Situated Peaceful Asylum Seekers**

102.    The Government's treatment of WPO and WPV is a part of the Government's plan
to punish asylum seekers.  CBP officers generally carried out separations of parents and children
under the family separation policy at various immigration detention sites near the southwestern
border, including the site where officers held and separated WPO and WPV after they entered the
United States.

103.    Immigration officials frequently put arriving parents and children in cells in short-term detention centers, such as the frigid *hielera* where WPO and WPV were detained. Immigration officials often told the parents that officials would take their children.

104.    Immigration officials often told parents, including WPV, that they committed a crime by crossing the border, even when parents crossed through official ports of entry.

105.    Many parents waited in terror as they watched immigration officials take children from their parents, knowing that their children's names might soon be called. Other parents were given no warning or opportunity to say goodbye to their children before officials separated parent from child, just as officials separated WPV from a sleeping WPO in the *hielera*.

106.    If the parents did not willingly hand their children over to immigration officials, the officials often forcibly ripped the children out of their parents' arms or forced parents like WPV to leave their children alone in a cell in a foreign country.

107.    Immigration officials separated children, such as WPO, as young as infants and as old as 17 from their parents, without regard to age or language ability.

108.    In many cases, immigration officials carried out the family separations with callous disregard to the anguish caused to parents and children like WPO and WPV.

109.    Parents often had to watch immigration officials walk their children out of the cells and out of their sight. In other instances, parents like WPV were forced to watch their child remain in a cell, isolated from any and all family, as immigration officials led the parent away.

110.    Many parents watched immigration officials separate other parents and children after they were separated from their own children, compounding the trauma.

111.    Similar to WPO's and WPV's experience, immigration officials often flew children thousands of miles away from their parents under the pretense that the separation was the necessary

result of the criminal prosecution of the parents. In an effort to create maximum chaos and harm, the government took the children regardless of whether their parents were taken into criminal custody, remained in criminal custody for any length of time, or were even prosecuted at all.

112.    After forcibly separating families, CBP transferred many parents into ICE custody.[37]   Upon information and belief, CBP or another agency transferred WPV into ICE custody.

113.    The government then classified the children, including WPO (upon information and belief), as "unaccompanied," even though they were accompanied by their parents when they arrived in the United States and remained accompanied until the government separated them from their parents and transferred the children to ORR custody. ORR is responsible for the long-term custodial care and placement of "unaccompanied alien children."[38]  *See* 6 U.S.C. § 279(a).  Upon information and belief, WPO was classified as an unaccompanied child, even though he was accompanied by his parent, WPV, when he arrived in the United States and remained accompanied until the government separated them WPV and WPO.

114.    As predicted by John Kelly, ORR staff then placed the children in "foster care or whatever."[39] The "whatever" included placement of many children in ORR facilities throughout

---

[37] Ex. 37, OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HOMELAND SECURITY, OIG-18-84, SPECIAL REVIEW - INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION ISSUES UNDER THE ZERO TOLERANCE POLICY (Sept. 27, 2018) [hereinafter DHS OIG REPORT], https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf at 2-3, 13, 15.

[38] *Id.* at 3.

[39] Ex. 38, Transcript: White House Chief of Staff John Kelly's Interview with NPR, NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

the United States, such as the Cayuga Centers in New York where WPO was detained apart from his father.

115.    The parents and children were not told where the other was located or when they would be able to see each other, or even speak to each other, again. Some parents, including WPV, had to wait weeks before speaking to their children. WPV had no information about where WPO was or how to contact WPO until he spoke with APV more than a month after officials separated him from WPV. In some cases, such as in the case of WPV and WPO, when parents finally obtained contact information for their children, they were told they had to pay to make phone calls, a significant obstacle for detained parents who had no resources.

116.    Parents suffered physically, mentally, and/or emotionally during the separation from their children.

117.    Likewise, children separated from their parents suffered physically, mentally, and/or emotionally. This trauma was aggravated by the fact that many children did not understand why they had been separated and some believed their parents had abandoned them.[40]

118.    In implementing the separation policy, the government significantly exacerbated the trauma it intended to cause by failing to take even the most basic steps to record which children belonged with which parents. The government's failures resulted in delays in parents' ability to locate and communicate with their children, and ultimately to be reunited, causing even more

---

[40] Ex. 39, OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-09-18-00431, CARE PROVIDER FACILITIES DESCRIBED CHALLENGES ADDRESSING MENTAL HEALTH NEEDS OF CHILDREN IN HHS CUSTODY 10 (Sept. 2019) [hereinafter "HHS OIG REPORT II"] ("Children who did not understand why they were separated from their parents suffered elevated levels of mental distress. For example, program directors and mental health clinicians reported that children who believed their parents had abandoned them were angry and confused.") https://oig.hhs.gov/oei/reports/oei-09-18-00431.asp.

anguish for separated families. These failures "also contributed to children's anxiety and fear for their parents' well-being."[41]

119.    The government's failure to ensure appropriate recordkeeping manifested itself in many ways. For example, ICE's computer system "did not display data from CBP's systems that would have indicated whether a detainee had been separated from a child."[42]

120.    As a result, when ICE processed detained parents for removal, "no additional effort [was made] to identify and reunite families prior to removal."[43]

121.    When the DHS Office of Inspector General ("OIG") pressed ICE for information that should have been available to ICE (e.g., information on the current location of separated children), ICE could not provide the information, and had to request it from HHS. DHS later "acknowledged to the OIG that there is no 'direct electronic interface' between the DHS and HHS tracking systems."[44]

122.    As emphasized by the Honorable Dana M. Sabraw of the Southern District of California in a ruling addressing the constitutionality of the family separation policy in *Ms. L. v. U.S. Immigration and Customs Enforcement*, the agencies' failure to coordinate tracking of separated families was a "startling reality" given that:

> The government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainee's release, at all levels—state and federal, citizen and alien. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children. The unfortunate reality

---

[41] *Id.* at 10-11.

[42] DHS OIG Report, *supra* note 37, at 9-10.

[43] *Id.* at 10.

[44] *Id.* at 10-11.

is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*. Certainly, that cannot satisfy the requirements of due process.[45]

123.    The government compounded the harm it caused by failing to provide parents and children, including Plaintiffs, with any information regarding each other's whereabouts or well-being for weeks and, in many cases, months, and by failing to facilitate adequate communication between parents and children.[46]

124.    Only after the family separation policy garnered widespread condemnation did then-President Trump, on June 20, 2018, sign an executive order ("EO") purporting to end it.

125.    The EO stated that it is the "policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources."[47]

---

[45] *Ms. L.,* 310 F. Supp. 3d at 1144 (emphasis in original).

[46] *See, e.g., id.* at 1136-37 ("[T]here is no genuine dispute that the Government was not prepared to accommodate the mass influx of separated children. Measures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children."); *see also* Ex. 40, Kevin Sieff, The Chaotic Effort to Reunite Immigrant Parents with Their Separated Kids, WASH. POST (June 21, 2018), https://www.washingtonpost.com/world/the_americas/the-chaotic-effort-to-reunite-immigrant-parents-with-their-separated-kids/2018/06/21/325cceb2-7563-11e8-bda1-18e53a448a14_story.html?utm_term=.f32056f25ced (reporting that "government authorities have often been unwilling to arrange phone calls between [separated parents and children], or provide details about where the child is held").

[47] Ex. 41, Affording Congress an Opportunity to Address Family Separation, Exec. Order No. 13,841, 83 Fed. Reg. 29,435 § 1 (June 20, 2018).

126.    The EO, however, did not explain whether or how the federal government would reunify children whom the government had forcibly separated from their parents. In fact, on June 22, 2018, the government admitted that it had no reunification procedure in place.[48]

127.    On June 26, 2018, in *Ms. L.*, Judge Sabraw ordered the government to reunify families. The class-wide preliminary injunction, among other things, prohibited the government from separating parents from their minor children in the future, absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within fourteen days, and with children aged five and older within thirty days.[49]   In WPV and WPO's case, the reunification never happened.

---

[48] *See Ms. L.,* 310 F. Supp. 3d at 1140–41 (*citing* Transcript of Status Conference at 29-30, *Ms. L.*, No. 18-cv-00428 DMS MDD (S.D. Cal. June 22, 2018), ECF No. 77); *see also* Ex. 42, U.S. GOV'T ACCOUNTABILITY OFF., GAO-19-163, UNACCOMPANIED CHILDREN: AGENCY EFFORTS TO REUNIFY CHILDREN SEPARATED FROM PARENTS AT THE BORDER 21 (Oct. 2018), https://www.gao.gov/products/gao-19-163 [hereinafter GAO REPORT] ("HHS officials told [the GAO] that there were no specific procedures to reunite children with parents from whom they were separated at the border prior to the June 2018 court order."). The only procedure in place capable of reuniting children with their parents was the procedure developed to place unaccompanied children with sponsors in compliance with the Trafficking Victims Protection Reauthorization Act. *Id.* Under this procedure, however, a parent could only be reunited with his or her child if the government deemed them eligible to be a sponsor. *Id.* Judge Sabraw noted that this procedure was inadequate because it was created to address "a different situation, namely what to do with alien children who were apprehended *without their parents* at the border or otherwise," and further, that the procedure was not developed to address situations such as this one where family units were separated by government officials after they crossed the border together. *Id.* at 27 (quoting Order Following Status Conference at 2, *Ms. L.*, No. 18-cv-00428 DMS MDD (S.D. Cal. July 10, 2018), ECF No. 101).

[49] *Ms. L.,* 310 F. Supp. 3d at 1149-50.

128.   Only after Judge Sabraw issued the injunction did the government begin taking meaningful steps to reunify families.[50]

129.   Those efforts, however, were defined by chaos. The government claimed that DHS and HHS had created a centralized database containing all relevant information regarding parents separated from their children. But there was "no evidence that such a database exists."[51]

130.   Any data the government collected was incomplete, contradictory, and unreliable.[52] Accordingly, the agencies resorted to a variety of inefficient and ineffective methods to determine which children were subject to Judge Sabraw's injunction,[53] including hand-sifting through agency data looking for any indication that a child in HHS custody had been separated from his or her parent,[54] and calling in the Office of the Assistant Secretary for Preparedness and Response, an HHS agency whose normal prerogative involves responding to hurricanes and other public health disasters, to review data provided by HHS, DHS, and ORR.[55]

131.   Consistent with Judge Sabraw's rulings, the government's policy of separating children from their parents in the absence of a determination that the parents were unfit or presented a danger to their children, and its failure to track the children and promptly reunite the

---

[50] *See Ms. L.,* 310 F. Supp. 3d at 1140-41.

[51] DHS OIG REPORT, *supra note* 30, at 10.

[52] *Id.* at 11-12.

[53] GAO REPORT, *supra* note 42, at 23-25.

[54] *Id.* at 24.

[55] *Id.* at 23.

families once they were separated violated the constitutional right to family integrity of the persons subject to the policy, including Plaintiffs.[56]

132.    As evidenced by Trump Administration officials' statements that the policy's purpose was to deter asylum seekers, the government's refusal to provide parents and children any information about each other's whereabouts and well-being, and its failure to track separated families and address reunification in any meaningful way until a federal judge ordered it to do so, the government instituted and implemented this policy to intentionally inflict emotional distress on the parents and children whom it separated. It succeeded, with devastating consequences for Plaintiffs.

## V.    COUNT I: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (United States)

133.    Plaintiffs incorporate the allegations of Paragraphs 1 through 132 as if the same were fully set forth herein.

134.    By engaging in the acts described in this Complaint, the federal officers and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

135.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

---

[56] *See Ms. L. v. U.S. Immigration and Customs Enf't,* 302 F. Supp. 3d 1149, 1161-67 (S.D. Cal. 2018) (finding that plaintiffs had stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children); *Ms. L.*, 310 F. Supp. 3d at 1142-46 (finding that plaintiffs were likely to succeed on the merits of their substantive due process claim); *see also Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) (liberty interest in family relationships has its source in "intrinsic human rights").

136.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

**VI.    COUNT II: NEGLIGENCE (United States)**

137.    Plaintiffs incorporate the allegations of Paragraphs 1 through 136 as if the same were fully set forth herein.

138.    The federal officers referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

139.    By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

140.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

141.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

**VII.    COUNT III: NEGLIGENCE (Cayuga Centers)**

142.    Plaintiffs incorporate the allegations of Paragraphs 1 through 141 as if the same were fully set forth herein.

143.    Cayuga Centers and its employees referenced above had a duty to Plaintiffs WPO and WPV to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs WPO and WPV.

144.    By engaging in the acts alleged herein, Cayuga Centers and its employees failed to act with ordinary care and breached their duty of care owed to Plaintiffs WPO and WPV.

145.    As a direct and proximate result of the referenced conduct, Plaintiffs WPO and WPV suffered substantial damages.

146.     Under New York state law, Cayuga Centers is liable to Plaintiffs WPO and WPV for negligence.

**VIII.   COUNT IV: BREACH OF FIDUCIARY DUTY (Cayuga Centers)**

147.     Plaintiffs incorporate the allegations of Paragraphs 1 through 146 as if the same were fully set forth herein.

148.     Cayuga Centers and its employees referenced above were guardians of WPO.

149.     In turn, WPO was a ward of Cayuga Centers.

150.     As guardians, Cayuga Centers and its employees had a fiduciary relationship to WPO as a child housed in their facilities.

151.     Among their obligations as guardians, Cayuga Centers and its employees were obligated to act in the best interest of WPO.

152.     As described more fully throughout this complaint, however, Cayuga Centers and its employees breached these fiduciary duties to WPO.

153.     As a direct and proximate result of those breaches, WPO suffered severe emotional distress.

**IX.    COUNT V:  REHABILITATION ACT (Cayuga Centers)**

154.     Plaintiffs incorporate the allegations of Paragraphs 1 through 153 as if the same were fully set forth herein.

155.     Under the Rehabilitation Act, a "disability" includes mental impairments that substantially limits someone in one or more major life activities.

156.     Significant trauma has been inflicted upon WPO.  As discussed herein, WPO faced danger in Honduras, embarked on a long and arduous journey to the United States and became quite sick during that process.  When taken into custody, him and his father were housed in

overcrowded and unsafe facilities (e.g., with criminals), and then were abruptly and purposefully separated while WPO was asleep.

157.    Thus, in light of the mental and emotional injuries created by his trauma, WPO was a qualified individual with a disability as defined in Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, 42 U.S.C. § 12102(1).

158.    Cayuga Centers receives federal funding.

159.    Under the Rehabilitation Act, no qualified individual with a disability may be excluded from participation in or be denied the benefits of the services, programs, or activities of a recipient of federal funding, or be subjected to discrimination by any such entity.

160.    To prevent discrimination, such recipients must make reasonable modifications to their policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless doing so would fundamentally alter the nature of the services provided by the entity.

161.    Due to the symptoms caused by his trauma, WPO had impairments that substantially limited one or more major life activities, including thinking, sleeping, eating, learning, and safe play. As a result of these disabilities, he required the ability to interact and develop in a therapeutic setting that did not restrict basic human interaction including, physical touch, hugging of family members, phone calls with family and relatives, and personal conversation. At the Cayuga Centers in New York, such accommodations could have been made without fundamentally altering the services that the Cayuga Centers provided.

162.    Even though it was well-known that children like WPO are disabled, the Cayuga Centers did not modify its programs and services to permit basic human interaction contact, and educational development, preventing WPO from participating in the programs and services offered

at the shelter.  If anything, in and around the time period of WPO's detainment at Cayuga Centers, the Cayuga Centers did the opposite: force the kids (such as WPO) into overcrowded conditions with tens of young kids crying and screaming as they are taken away from their parents without sufficient medical staffing, teachers, and trainers for the detained kids.[57] And to avoid scrutiny, Cayuga Centers and its employees instructed the detained kids that they were not allowed to speak to the media, and that if they did, there would be consequences.[58]

163.    WPO was injured by the failure of Cayuga Centers to provide reasonable accommodation of their disabilities, as described herein.

## X.    JURY DEMAND

164.    Plaintiffs request a jury trial as to all issues that are triable by a jury in this action.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

(a)    Compensatory damages;

(b)    Punitive damages;

(c)    Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(c)    Such other and further relief as the Court deems just and appropriate.

---

[57] *See supra* note 34.

[58] *Id.*

Respectfully submitted,

Dated: May 17, 2021                    FISH & RICHARDSON P.C.


By:  */s/ Aamir A. Kazi*
       Aamir A. Kazi (*pro hac vice pending*)
       GA Bar No. 104235
       Karan Jhurani*
       GA Bar No. 290326
       Fish & Richardson P.C.
       1180 Peachtree Street NE
       21st Floor
       Atlanta, GA 30309
       Telephone: 404-892-5005
       Fax: 404-892-5002
       kazi@fr.com
       jhurani@fr.com

       Caitlin M. Dean*
       TX Bar No. 24109797
       Fish & Richardson P.C.
       222 Delaware Avenue
       17th Floor
       Wilmington, DE 19801
       Telephone: 302-653-5070
       Fax: 302-652-0607
       cdean@fr.com

       ***Attorney for Plaintiff W.P.V., on his own
       behalf and on behalf of his minor child,
       W.P.O.***


*\*Pro hac vice* applications forthcoming