UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

W.P.V. & W.P.O.,

                Plaintiffs,

      - against –

UNITED STATES OF AMERICA and CAYUGA
HOME FOR CHILDREN,

              Defendants.

21 Civ. 04436 (JPC)

---

## <u>MEMORANDUM OF LAW IN SUPPORT OF</u><br><u>DEFENDANT UNITED STATES OF AMERICA'S MOTION TO TRANSFER VENUE</u>

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for Defendant United States
86 Chambers Street, Third Floor
New York, New York 10007
Tel:   (212) 637-2614 / 3274

REBECCA R. FRIEDMAN
MOLLIE KORNREICH
Assistant United States Attorneys
   – Of Counsel –

**TABLE OF CONTENTS**

PAGE

I.   INTRODUCTION ...................................................................................................1

II.  FACTUAL AND LEGAL BACKGROUND ........................................................2

    A.   Statutory Framework for Noncitizens Entering the Country ......................2

    B.   Statutory Framework for Immigration Custody of Unaccompanied Minors..............3

    C.   Flores Agreement Requirements...................................................................4

    D.   Executive Branch Directives Regarding Immigration Enforcement ............5

    E.   Detention, Separation, and Reunification of Plaintiffs .................................6

    F.   Subsequent Policy Changes ..........................................................................8

    G.   Plaintiffs' Complaint ....................................................................................8

III. LEGAL STANDARDS .........................................................................................9

    A.   Transfer Under 28 U.S.C § 1401(a) .............................................................9

IV.  ARGUMENT .......................................................................................................11

    A.   The Court Should Transfer This Action to the Western District of Texas .................11

        1.   Venue Is Proper in the Western District of Texas .............................11

        2.   The Balance of Relevant Factors Strongly Favors Transfer ................11

            a.   The Convenience of Witnesses .................................................12

            b.   The Convenience of Parties Favors Transfer .....................................14

            c.   Location of Proof .......................................................................15

            d.   Most Operative Facts Occurred in the Western District of Texas .................15

            e.   Availability of Compulsory Process .........................................16

            f.   Means of the Parties ..................................................................17

            g.   The Forum's Familiarity with Governing Law ................................17

            h.   Plaintiffs Choice of Forum Should be Afforded Diminished Weight ............18

            i.   Trial Efficiency and the Interests of Justice Favor Transfer............................18

V.   CONCLUSION....................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpha Indus., Inc. v. Alpha Clothing Co. LLC*,
   No. 21 Civ. 87 (KPF), 2021 WL 2688722 (S.D.N.Y. June 30, 2021)......................................15

*Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western District of Texas*,
   571 U.S. 49 (2013).................................................................................................................10

*Barton v. Barr*,
   140 S. Ct. 1442 (2020)..............................................................................................................2

*Bunikyte v. Chertoff*,
   No. 07-164, 2007 WL 1074070 (W.D. Tex. Apr. 9, 2007) .......................................................5

*Burgos  v. United States*,
   16 Civ. 7091 (RA), 2017 WL 2799172 (S.D.N.Y. June 27, 2017) .........................................10

*Cain v. New York State Bd. of Elections*,
   630 F. Supp. 221 (E.D.N.Y. 1986) ..........................................................................................10

*Corley v. United States*,
   11 F.4th 79 (2d Cir. 2021) .......................................................................................................10

*Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*,
   928 F. Supp. 2d 735 (S.D.N.Y. 2013)......................................................................................15

*Flores v. Lynch*,
   828 F.3d 898 (9th Cir. 2016) .................................................................................................4, 5

*Flores v. Rosen*,
   984 F.3d 720 (9th Cir. 2020) .....................................................................................................4

*Frame v. Whole Foods Mkt., Inc.*,
   No. 06 Civ. 7058 (DAB), 2007 WL 2815613 (S.D.N.Y. Sept. 24, 2007)................................18

*Freeplay Music, LLC v. Gibson Brands, Inc.*,
   195 F. Supp. 3d 613 (S.D.N.Y. 2016).......................................................................................12

*Guccione v. Harrah's Marketing Services Corp*,
   06 Civ. 4361 (PKL), 2009 WL 2337995 (S.D.N.Y. July 29, 2009). ........................................15

*It's a 10, Inc. v. PH Beauty Labs, Inc.*,
   718 F. Supp. 2d 332 (S.D.N.Y. 2010).......................................................................................17

*Jones v. United States*,
  No. 02 Civ. 1017 (JG), 2002 WL 2003191 (E.D.N.Y. Aug. 26, 2002) ............................ 18, 19

*Kaufman v. Salesforce.com, Inc.*,
  No. 20 Civ. 6879 (JPC) (SN), 2021 WL 2269552 (S.D.N.Y. June 3, 2021) ..................... 10, 18

*Larca v. United States*,
  No. 11 Civ. 3952 (JMF), 2012 WL 6720910 (S.D.N.Y. Dec. 16, 2012) .......................... 16, 19

*Monfried v. Sigma Fin. Corp.*,
  No. 15 Civ. 2806 (VSB), 2016 WL 9724977 (S.D.N.Y. June 14, 2016) ............................... 15

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
  599 F.3d 102 (2d Cir. 2010) ..................................................................................... 10

*Ruiz ex rel. E.R. v. United States*,
  No. 13 Civ. 1241 (KAM) (SMG), 2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014) ........... 13, 19

*Schuyler v. Sun Life Assurance Co. of Canada*,
  No. 20 Civ. 10905 (RA) (BCM), 2021 WL 5853991 (S.D.N.Y. Dec. 9, 2021) ..................... 12

*United States v. Dominguez-Portillo*,
  No. 17-MJ-4409, 2018 WL 315759 (W.D. Tex. Jan. 5, 2018) ............................................. 4, 5

*Williams v. Swack*,
  No. 12 Civ. 1552 (CBA), 2013 WL 5423791 (E.D.N.Y. Sept. 26, 2013) ............................... 12

*Wyndham Associates v. Bintliff*,
  398 F.2d 614 (2d Cir 1968) ..................................................................................... 10

**Statutes**

6 U.S.C. § 279(2)(B) ..................................................................................................... 3

6 U.S.C. § 279(a) ........................................................................................................ 3

6 U.S.C. § 279(g)(2) ..................................................................................................... 3

8 U.S.C. § 1225(a)(1) ..................................................................................................... 2

8 U.S.C. § 1225(b) ........................................................................................................ 2

8 U.S.C. § 1232 ......................................................................................................... 3, 4

8 U.S.C. § 1325 ..................................................................................................... *passim*

8 U.S.C. § 1182(d)(5) ..................................................................................................... 3

28 U.S.C. § 1391 ..................................................................................................... 11

28 U.S.C. § 1391(b) ................................................................................................... 9

28 U.S.C. § 1402(b) ............................................................................................ 9, 11

28 U.S.C. § 1404(a) ......................................................................................... *passim*

28 U.S.C. § 1346(b)(1) .............................................................................................. 9

**Rules**

Fed. R. Civ. P. 45 ................................................................................................ 16, 17

**Other Authorities**

Attorney General of the United States, "Memorandum for Federal Prosecutors along the
Southwest Border" (the "Zero-Tolerance Memorandum") (April 6, 2018) ............................ 5

*Establishment of Interagency Task Force on the Reunification of Families*, Exec. Order 14011,
§ 1, 86 Fed. Reg. 8273, 8273 (Feb. 2, 2021) ...................................................... 1, 8

Executive Order 13767 (EO 13767), 82 Fed. Reg. 8793 (Jan. 25, 2017). ................................. 5, 6

*Flores v. Sessions*,
No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) ............................................................. 4

U.S. DOJ Memorandum on Renewed Commitment to Criminal Immigration Enforcement
(April 11, 2017). ...................................................................................... 5-6

U.S. Department of Homeland Security, Interim Progress Report, Interagency Task Force
on the Reunification of Families (Nov. 29, 2021) ..................................................... 8

# I.  <u>INTRODUCTION</u>

Plaintiffs bring this action against the United States under the Federal Tort Claims Act ("FTCA") to recover for alleged injuries to a father and minor son caused by the implementation of zero-tolerance policies for noncitizens detained on suspicion of illegal entry at the United States–Mexico border in May 2018.  Plaintiffs assert claims against the United States for intentional infliction of emotional distress and negligence arising out of Plaintiffs' separation and their treatment after crossing into the United States.  *See* ECF No. 4 ("Complaint" or "Compl.") ¶¶ 133-141.  Plaintiffs also assert claims against a non-government organization, Cayuga Home for Children ("Cayuga Centers"), for breach of fiduciary duty, negligence, and violation of the Rehabilitation Act based on the organization's treatment of the minor plaintiff while he was in the organization's care and custody.  *See id.* ¶¶ 142-163.

The United States has denounced the prior practice of separating children from their families at the United States–Mexico border and "condemn[ed] the human tragedy that occurred [because of] the Zero-Tolerance Policy."  *Establishment of Interagency Task Force on the Reunification of Families*, Exec. Order 14011, § 1, 86 Fed. Reg. 8273, 8273 (Feb. 2, 2021) ("Family Reunification Task Force EO").  The Biden Administration has committed the federal government to "protect family unity and ensure that children entering the United States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law."  *Id.*

With respect to this matter, the Court should not reach the merits of Plaintiffs' claims because the Western District of Texas is the most appropriate and convenient forum for them to be heard.  The separation of Plaintiffs W.P.O. and W.P.V. in Texas is the primary subject of this action and the entire focus of the claims against the government.  The operative facts and majority of witnesses are located in Texas, which also supplies the governing law for the claims against the government.   Plaintiffs unlawfully crossed the United States–Mexico border near El Paso, Texas.  They both were detained in Texas.  And the primary allegations relate to the separation of Plaintiffs, which occurred at a U.S. Customs and Border Protection ("CBP") processing center

within the Western District of Texas, and their detention in that jurisdiction.  Neither Plaintiff resides here—in fact, one of the Plaintiffs resides in Texas, while the other resides in Honduras. *See* Compl. ¶¶ 19-20.  The Court should therefore transfer this action to the Western District of Texas pursuant to 28 U.S.C. § 1404(a), for the convenience of the parties and witnesses and in the interest of justice.  In the alternative, the Court should sever the claims against the United States and transfer those claims to the Western District of Texas.

## II.   FACTUAL AND LEGAL BACKGROUND

### A.   Statutory Framework for Noncitizens Entering the Country.[1]

Noncitizens who arrive in the United States, including those who arrive between ports of entry, are considered "applicant[s] for admission" and are required to be "inspected by immigration officers" to determine their admissibility to the United States.  8 U.S.C. § 1225(a)(1), (a)(3), (b).  When a noncitizen enters the United States between official ports of entry, he or she may be prosecuted for criminal immigration violations, including entering the United States "at any time or place other than as designated by immigration officers" and eluding "examination or inspection by immigration officers."  8 U.S.C § 1325(a).  Section 1325(a) sets out a misdemeanor that is punishable by a fine and "imprison[ment] not more than 6 months" for a first infraction.  *Id*.

Noncitizens arriving in or present in the United States who are deemed inadmissible are subject to removal from the United States and, as appropriate, detention pending such removal. *See* 8 U.S.C. §§ 1225(b), 1226, 1357.  These provisions apply to both adults and their accompanying children.  In some cases, the Department of Homeland Security ("DHS") may exercise its discretion to release a noncitizen from custody pending a decision on removal.  *See, e.g.*, 8 U.S.C. §§ 1182(d)(5), 1226(a)(2).

---

[1] This brief uses the term "noncitizen" as equivalent to the statutory term "alien."  *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (quoting 8 U.S.C. § 1101(a)(3)).

B.    <u>**Statutory Framework for Immigration Custody of Unaccompanied Minors.**</u>

Federal immigration law authorizes the United States to provide for the custody and care of minor children entering the United States without authorization.  Specifically, the Department of Health and Human Services' Office of Refugee Resettlement ("ORR") is charged with "the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration status."  6 U.S.C. § 279(a), (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1).  The term "unaccompanied alien child" or "UAC" is defined as a child who: (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) "with respect to whom . . . there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody."  6 U.S.C. § 279(g)(2).

Under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), "[e]xcept in the case of exceptional circumstances, any department or agency . . . shall transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is an unaccompanied alien child."  8 U.S.C. § 1232(b)(3).  ORR seeks to place UACs "in the least restrictive setting that is in the best interest of the child."  *Id.* § 1232(c)(2)(A).  However, ORR "shall not release such children upon their own recognizance."  6 U.S.C. § 279(2)(B).  Rather, once in ORR custody, there are detailed statutory and regulatory provisions that must be applied before the child is released to an approved sponsor.  *See* 8 U.S.C. § 1232(c)(3).  Congress requires that "an unaccompanied alien child may not be placed with a person . . . unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being" and that "[s]uch determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as

3

well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* § 1232(c)(3)(A).  In some instances, a home study is required. *Id*. § 1232(c)(3)(B).

### C.    Flores Agreement Requirements.

In 1996, the federal government entered into a settlement agreement referred to as the "Flores Agreement." *See, e.g., Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) (ECF No. 101).  The Flores Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the [immigration authorities]." *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) (citing Flores Agreement ¶ 9).  The Flores Agreement applies both to unaccompanied minors and to minors who are encountered together with their parents or legal guardians. *Id.* at 901.  Under the Flores Agreement, the government must expeditiously transfer any minor who cannot be released from custody to a non-secure, licensed facility.  *Id*. at 902-03 (quoting Flores Agreement ¶ 12).  The government must also "make and record the prompt and continuous efforts on its part toward . . . release of the minor." *Flores v. Rosen*, 984 F.3d 720, 738 (9th Cir. 2020) (quoting Flores Agreement ¶ 14).

The Flores Agreement applies only to minors.  *Flores*, 828 F.3d at 901.  It "does not address . . . the housing of family units and the scope of parental rights for adults apprehended with their children[,]" and it "does not contemplate releasing a child to a parent who remains in custody, because that would not be a 'release.'"  *Flores*, 828 F.3d at 906; *see also United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *9 (W.D. Tex. Jan. 5, 2018) ("[*Flores*] does not provide that parents are entitled to care for their children if they were simultaneously arrested by immigration authorities[.]"), *aff'd United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018) and 924 F.3d 164 (5th Cir. 2019).  Nor does the Flores Agreement

4

provide any rights to adult detainees, including any rights of release. *Flores*, 828 F.3d at 908; *see also Dominguez-Portillo*, 2018 WL 315759, at *14-15; *Bunikyte v. Chertoff*, No. 07-164, 2007 WL 1074070, at *16 (W.D. Tex. Apr. 9, 2007). Although the Flores Agreement gives preference to release of minors to a parent, this preference "does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice." *Flores*, 828 F.3d at 908.

      D.    **<u>Executive Branch Directives Regarding Immigration Enforcement.</u>**

In 2017 and 2018, the Executive Branch issued several directives regarding enforcement of federal immigration laws. First, Executive Order 13767 (EO 13767) was issued in January 2017. *See* § 1, 82 Fed. Reg. 8793 (Jan. 25, 2017). The EO stated that "[i]t is the policy of the executive branch to . . . detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations[.]" *Id*. § 2(b). Executive Order 13767 directed DHS to "ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law," *id*. § 6, and to exercise its parole authority "only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." *Id*. § 11(d).

Second, on April 11, 2017, the Department of Justice ("DOJ") issued guidance to all federal prosecutors regarding a renewed commitment to criminal immigration enforcement and directed that federal law enforcement prioritize the prosecution of several immigration offenses, including illegal entry under 8 U.S.C. § 1325. *See* U.S. DOJ Memorandum on Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), available at

https://www.justice.gov/opa/press-release/file/956841/download.

On April 6, 2018, then-Attorney General Sessions issued a "Memorandum for Federal Prosecutors along the Southwest Border" (the "Zero-Tolerance Memorandum"), available at https://www.justice.gov/opa/press-release/file/1049751/download.   The memorandum directed federal prosecutors along the Southwest border "to the extent practicable, and in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)."   *Id*.   Consistent with EO 13767 and the April 2018 Zero-Tolerance Memorandum, DHS began to refer for prosecution increased numbers of adults – including those traveling with children – who unlawfully entered the United States on the Southwest border in violation of Section 1325.  *See generally* Executive Order 13767.  Minor children of those adults were transferred to ORR custody as required by the TVPRA.  *See supra* at 3-4.

### E.   Detention, Separation, and Reunification of Plaintiffs.

According to the Complaint, Plaintiffs are a father and son from Honduras who illegally crossed the United States-Mexico border in May 2018 near El Paso, Texas.  Compl. ¶¶ 46, 51, 52. Shortly after crossing the border, Plaintiffs were apprehended by U.S. Customs and Border Protection ("CBP") Border Patrol Agents.   Declaration of Border Patrol Agent David Garcia ("Garcia Decl.") ¶ 9.   While at the border, Plaintiff W.P.V. was interviewed by Border Patrol Agents, and he admitted that he and his son W.P.O. had unlawfully entered the United States.  *Id.* ¶ 10.  Plaintiffs were then transported to CBP's Paso Del Norte Patrol Processing Center ("PDT") in El Paso, Texas, where W.P.V. was processed for expedited removal.  *Id.* ¶¶ 11-12.

Plaintiffs were separated from each other during their initial custody at PDT.  Compl. ¶ 66; *see also* Garcia Decl. ¶¶ 11-17 (noting Plaintiffs' separation occurred in El Paso, Texas).  On May 24, 2018, the U.S. Attorney's Office for the Western District of Texas approved the criminal

prosecution of Plaintiff W.P.V. under 8 U.S.C. § 1325(a)(l) based on his entry without inspection. Garcia Decl. ¶ 13.   That same day, CBP notified the local Field Office Juvenile Coordinators ("FOJC") and ORR's national office regarding Plaintiff W.P.O.'s separation from his father.  *Id.* ¶ 14.

On May 25, 2018, Plaintiff W.P.V. was transferred to the United States Marshal's Service ("USMS") for detention at the El Paso County Detention Facility ("EPCDF") based on the U.S. Attorney's approval to criminally prosecute him.  *Id.* ¶ 17.   W.P.O. was transferred to the Clint, Texas Border Patrol Station ("CTX"), where he remained until May 26, 2018.  *Id.* ¶ 15.   Based on the U.S. Attorney's Office's decision to prosecute Plaintiff W.P.V., Plaintiff W.P.O. was processed on May 25, 2018, as a UAC.  *Id.* ¶ 16.   On May 26, 2018, Plaintiff W.P.O. was placed with ORR as a UAC and remained in the legal custody of ORR from May 26, 2018, to July 1, 2018. Declaration of James De La Cruz ("De La Cruz Decl.") ¶ 4.   For the entirety of the time W.P.O. was in ORR custody, W.P.O. was cared for at Cayuga Centers, an ORR-funded care provider facility, in Bronx County, New York, through its Transitional Foster Care program.  *Id.*  Cayuga Centers is not a detention center; it is an ORR-funded charitable organization that provides care and shelter for UACs while attempting to identify a sponsor to care for the child.  *Id.*  On July 1, 2018, W.P.O. was released to his sponsor—his aunt in Farmers Branch, Texas.  *Id.* ¶ 5.

Meanwhile, on May 29, 2018, a criminal complaint was filed in the Western District of Texas, El Paso Division, charging W.P.V. with a violation of 8 U.S.C. § 1325.  Garcia Decl. ¶ 18. On June 1, 2018, Plaintiff W.P.V. was convicted of violating 8 U.S.C. § 1325(a)(1).  *Id.* ¶ 19.

Plaintiff W.P.V. first entered U.S. Immigration and Customs Enforcement ("ICE") custody on June 4, 2018, upon his release from the USMS custody at EPCDF.  Declaration of Cesar A. Cervantes ("Cervantes Decl.") ¶ 6; Garcia Decl. ¶ 19.  W.P.V. was booked into the El Paso Service

Processing Center in El Paso, Texas on June 4, 2018, to await his transfer, and on June 5, 2018, Plaintiff W.P.V. was transferred to the Cibola County Correctional Center in Milan, New Mexico, where he remained until June 25, 2018.  Cervantes Decl. ¶¶ 6-7.  On June 25, 2018, Plaintiff W.P.V. was again booked into the El Paso Service Processing Center in El Paso, Texas, where he awaited his next transfer.  *Id.* ¶ 8.  And on June 26, 2018, Plaintiff W.P.V. was transferred to the Otero County Processing Center in Chaparral, New Mexico, where he remained until his expedited removal to Honduras on July 11, 2018.  *Id.* ¶ 9.

### F.    Subsequent Policy Changes.

After assuming office, President Biden took action to repudiate the policies that led to Plaintiffs' separation and to reunify the families that were affected by those policies.  On February 2, 2021, the President issued an Executive Order that condemned the "human tragedy" of the prior Administration's Zero-Tolerance Policy and committed the United States government to "protect family unity and ensure that children entering the United States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law."  Family Reunification Task Force EO § 1.  That Order created a Task Force to identify and reunify families separated under the Zero-Tolerance Policy, and to make recommendations for the potential provision of immigration benefits and mental-health services to those separated families.  *Id.* § 4; *see also* Interim Progress Report, Interagency Task Force on the Reunification of Families (Nov. 29, 2021), available at https://www.dhs.gov/sites/default/files/2021-12/21_1129_s1_interim-progress-report-family-reunification-task-force.pdf .

### G.    Plaintiffs' Complaint.

Plaintiffs bring this action against the United States under the FTCA, 28 U.S.C.

§§ 1346(b)(1), 2671-2680, seeking damages for intentional infliction of emotional distress (First Claim) and negligence (Second Claim) stemming from the separation of Plaintiffs from one another (Second Claim).  Compl. ¶¶ 133-141.  Plaintiffs also bring three claims against Cayuga Centers relating to care for W.P.O. when he was in its care and custody – negligence (Third Claim), breach of fiduciary duty (Fourth Claim), and violation of the Rehabilitation Act (Fifth Claim).  *Id.* ¶¶ 142-163.  The Complaint asserts that this District is a proper venue because a substantial portion of the acts and omissions that are the subject of this Complaint occurred here.  *Id.* ¶ 14.

### III.      LEGAL STANDARDS

#### A.      Transfer Under 28 U.S.C. § 1404(a).

In specified circumstances, the FTCA authorizes suit against the United States for conduct that constitutes a tort under state law.  The applicable substantive state law is "the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  Venue is governed by 28 U.S.C. § 1402(b), which permits FTCA claims to be prosecuted "in the judicial district where the plaintiff resides or where the act or omission complained of occurred."  28 U.S.C. § 1402(b).  For claims brought against non-government defendants such as Cayuga Centers, as relevant here, venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b).[2]

Even when venue is proper, 28 U.S.C. § 1404(a) authorizes transfer to a more convenient forum in the interest of justice:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

---

[2] A civil action may also be brought in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located," or, if there is no district in which an action can otherwise be brought, "any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."  28 U.S.C. § 1391(b).

*Id.*  A district court's analysis under Section 1404(a) considers both private factors, which go to the convenience of the parties and witnesses, and public factors, which go to the interests of justice. *See Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western District of Texas*, 571 U.S. 49, 62-63 (2013).  "District courts have broad discretion in making determinations of convenience under Section 1404(a)." *Corley v. United States*, 11 F.4th 79, 89 (2d Cir. 2021) (internal citation and quotation marks omitted).

In deciding a motion to transfer venue, courts engage in a two-part inquiry.  *See Burgos v. United States*, 16 Civ. 7091 (RA), 2017 WL 2799172, at *2 (S.D.N.Y. June 27, 2017).  "First, the court must determine whether the action could have been brought in the proposed transferee forum."  *Id.* (internal citation and quotation marks omitted).  "Second, the court must . . . determine whether transfer is appropriate."  *Id.* (internal citation and quotation marks omitted).  In determining whether transfer is appropriate, courts in this District consider the following factors:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*Kaufman v. Salesforce.com, Inc.*, No. 20 Civ. 6879 (JPC) (SN), 2021 WL 2269552, at *3 (S.D.N.Y. June 3, 2021) (citation omitted).  The party requesting the transfer bears the burden of establishing that transfer is warranted by clear and convincing evidence.  *Id.* (citing *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010)).

Where a complaint asserts claims against multiple defendants, a court may order severance of the claims, creating two separate actions, and "pursuant to § 1404(a), transfer certain of such separate actions while retaining jurisdiction of others."  *Wyndham Associates v. Bintliff*, 398 F.2d 614, 618 (2d Cir 1968); *see also Cain v. New York State Bd. of Elections*, 630 F. Supp. 221, 223 (E.D.N.Y. 1986) ("Even when venue is proper, a court may determine that, in the interest of justice,

an action between multiple defendants should be severed and certain claims transferred to a more convenient forum.").

## IV.      ARGUMENT

### A.      The Court Should Transfer This Action to the Western District of Texas.

#### 1.      Venue Is Proper in the Western District of Texas.

This action plainly could have been filed in the United States District Court for the Western District of Texas.  The government can be sued for FTCA claims "in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred."  28 U.S.C. § 1402(b).  Similarly, with respect to the claims against Cayuga Centers, venue is proper in the Western District of Texas because "a substantial part of the events or omissions giving rise to the claim[s] occurred" there.  *See* 28 U.S.C. § 1391.  Plaintiffs primarily complain of government conduct that occurred when they entered the United States near El Paso, Texas (in the Western District of Texas) and in the immediate aftermath, while they were detained in Texas.  *See generally* Compl. ¶¶ 51-80.  The separation of W.P.O. and W.P.V., which is the crux of their claims, took place in the Western District of Texas.  *See, e.g.*, *id.* ¶¶ 133-141; *see also id.* ¶ 132 (alleging the government "instituted and implemented this [family separation] policy to intentionally inflict emotional distress on the parents and children whom it separated.").  Further, Plaintiff W.P.O. asserts that he resides in Texas, *id.* ¶ 19, while Plaintiff W.P.V. resides outside of the United States, *id.* ¶ 20.  As this action could have been commenced in the Western District of Texas, the Court should proceed to evaluate the relevant factors to determine if transfer is appropriate.

#### 2.      The Balance of Relevant Factors Strongly Favors Transfer.

The convenience of the parties and witnesses substantially favors transfer of this action, or at least the claims against the United States.  The vast majority of the likely witnesses to the alleged

tortious conduct and its impact on Plaintiffs, including most of the government's witnesses and Plaintiffs themselves, reside at least hundreds of miles from this District, and the bulk of them are in the Western District of Texas.  Accordingly, holding the proceedings in this District would be much less convenient.  Likewise, the interests of justice also favor transfer to the jurisdiction where the actions giving rise to Plaintiffs' claims primarily occurred and the majority of witnesses are located.  In addition, the Western District of Texas appears to be a more convenient venue for Plaintiffs and their counsel.  The case should therefore be transferred or, in the alternative, the claims against the government should be severed and transferred.

a.      **The Convenience of Witnesses.**

"Courts typically regard the convenience of witnesses as the most important factor in considering a § 1404(a) motion to transfer."  *Schuyler v. Sun Life Assurance Co. of Canada*, No. 20 Civ. 10905 (RA) (BCM), 2021 WL 5853991, at *3 (S.D.N.Y. Dec. 9, 2021) (internal citation and quotation marks omitted).   Courts must consider the "materiality, nature, and quality of each witness, not merely the number of witnesses in each district."  *Freeplay Music, LLC v. Gibson Brands, Inc.*, 195 F. Supp. 3d 613, 617 (S.D.N.Y. 2016) (internal citation and quotation marks omitted).   While it is possible to take the testimony of material witnesses by video, it is "far from optimal."  *See, e.g.*, *Williams v. Swack*, No. 12 Civ. 1552 (CBA), 2013 WL 5423791, at *5 (E.D.N.Y. Sept. 26, 2013).

Based on the government's preliminary assessment of the claims against it, the critical witnesses who have knowledge of the facts regarding the government's allegedly tortious conduct are located in or close to the Western District of Texas, with the exception of one of the Plaintiffs, who alleges that he resides in Honduras. Compl. ¶ 20.  The majority of the nine potential witnesses from CBP who were involved in the apprehension and processing of Plaintiffs while they were in

the custody of U.S. Border Patrol, including the criminal prosecution of W.P.V., are assigned to the El Paso Sector ("EPT Sector"), which consists of stations in New Mexico and Texas. *See* Garcia Decl. ¶¶ 4, 20. More specifically, eight of the nine potential CBP witnesses were assigned to the EPT Sector at the time of Plaintiffs' apprehension. *Id.* at ¶ 20. Currently, one of those agents is assigned to the Santa Teresa Station, five of those agents are assigned to the El Paso Station, one of those agents is assigned to a station in San Diego, CA, and two of those agents have recently retired. *Id.* Moreover, the last known addresses for the two recently retired agents are in Texas. *Id.*

To the government's knowledge, no potential government witnesses for the claims against it are in or near this District. While it is sometimes presumed that employees of the government are available in any venue, this does not diminish the burden on the government to produce the numerous government witnesses for depositions and for trial in New York. Therefore, this factor strongly favors transfer. *See Ruiz ex rel. E.R. v. United States*, No. 13 Civ. 1241 (KAM) (SMG), 2014 WL 4662241, at *11-13 (E.D.N.Y. Sept. 18, 2014) (transferring FTCA case to the Eastern District of Virginia where plaintiff alleged that CBP improperly detained minor at Washington Dulles International Airport when, among other things, none of the eight CBP officers who had first-hand knowledge of the events resided in New York).

Furthermore, additional witnesses may be needed to rebut Plaintiffs' allegations that W.P.O. and W.P.V. were held in detention conditions that allegedly violated CBP standards. Compl. ¶¶ 53-65. While these rebuttal witnesses cannot all be currently identified because discovery has not opened, they are likely to be in or near El Paso, in the Western District of Texas, where Plaintiffs allege this misconduct occurred. *See id.*

While witnesses to W.P.O.'s placement at Cayuga Centers may be located in New York,

the primary witness with respect to Plaintiffs' claims against Cayuga Centers is W.P.O. himself, who resides in Texas.  Further, any witnesses to W.P.O.'s current physical and mental health are likely to be located in Texas.

b.   **The Convenience of the Parties Favors Transfer.**

The convenience of the parties also favors transfer.  It would be more convenient for the government to litigate this case in the Western District of Texas, where the alleged wrongdoing took place and critical witnesses are located.  Further, New York does not appear to be a convenient forum for Plaintiffs, one of whom lives in Texas and the other of whom lives substantially closer to Texas than New York.  Nor does New York appear to be convenient for Plaintiffs' counsel, who are located in Georgia and Delaware.  *See* ECF Nos. 3, 12, 14 (Plaintiffs' counsel's *pro hac vice* motions).  Indeed, Plaintiffs' contacts with the Western District of Texas are substantial—that is where they entered the United States; where they were apprehended, initially held in custody, and separated; where W.P.V. entered his guilty plea; and where the Complaint alleges Plaintiffs suffered the most egregious wrongs at the hands of the government.  The actual increased burden on Plaintiffs prior to trial if the case is transferred would likely be minimal.  None of their counsel are located within hundreds of miles of this Court, and nearly all discovery on the claims against the government will be conducted in Texas, whether those claims are transferred or not.  And while it may be less convenient for Cayuga Centers to litigate in the Western District of Texas, the difference likely is not substantial given the limited number of witnesses located in New York.[3]

---

[3] To the extent inconvenience to Cayuga Centers is a consideration, severance of the claims against the government and those against Cayuga Centers presents an alternative that would be convenient for all parties.  Claims against the government and Cayuga Centers involve different witnesses on liability.  To the extent this case is severed and either action survives defendants' anticipated motions to dismiss, discovery in the two surviving actions will likely focus on different conduct.  The government notes that if the transfer motion is granted, Cayuga Centers has informed the Court that it anticipates filing a motion for severance.  *See* ECF No. 60 at 2-3; ECF No. 61 at 2.

By contrast, the inconvenience to the government of litigating this case across the country from where the events occurred would be substantial.

c.     **Location of Proof**

The government is currently unaware of any relevant government documents that are located solely in either the Western District of Texas or this District.  This factor is therefore neutral in the transfer analysis.  *See Monfried v. Sigma Fin. Corp.*, No. 15 Civ. 2806 (VSB), 2016 WL 9724977, at \*4 (S.D.N.Y. June 14, 2016) (finding this factor neutral where neither party detailed the existence of relevant proof in the transferee or transferor districts).

d.     **Most Operative Facts Occurred in the Western District of Texas.**

"The location of the operative events is a primary factor in determining a § 1404(a) motion to transfer."  *Alpha Indus., Inc. v. Alpha Clothing Co. LLC*, No. 21 Civ. 87 (KPF), 2021 WL 2688722, at \*6 (S.D.N.Y. June 30, 2021) (internal citation and quotation marks omitted); *see also Guccione v. Harrah's Marketing Services Corp.*, 06 Civ. 4361 (PKL), 2009 WL 2337995, at \*8 (S.D.N.Y. July 29, 2009).   Transfer to the district where the operative events occurred serves "the interests of justice."  *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 745 (S.D.N.Y. 2013) (internal citation and quotation marks omitted).  "To determine where the locus of operative facts lies, courts look to the site of events from which the claim arises."  *Guccione*, 2009 WL 2337995, at \*8 (internal quotation marks and citation omitted).

Here, the bulk of the alleged wrongdoing occurred (if at all) in the Western District of Texas.  Plaintiffs entered the United States near El Paso, Texas (in the Western District of Texas), and that is where both were apprehended, initially held in custody, and where Plaintiffs were allegedly subject to detention conditions that violated CBP internal policies.  Compl. ¶¶ 51-65.

15

The Western District of Texas is also where the family separation occurred.  *Id.* ¶¶ 66-67; Garcia Decl. ¶¶ 11-17 (separation occurred at CBP's PDT in El Paso, Texas).  Texas is the only state where both Plaintiffs were held in custody; indeed there are no allegations that W.P.V. ever set foot in New York.  *See generally* Garcia Decl.; Cervantes Decl. ¶ 10.

Texas is also where W.P.V. was criminally prosecuted for violating 8 U.S.C. § 1325(a)(1). Garcia Decl. ¶¶ 13, 18.  Specifically, on May 24, 2018, the United States Attorney's Office for the Western District of Texas approved W.P.V.'s prosecution under 8 U.S.C. § 1325(A)(1) based on his illegal entry, and further approved separation of the Plaintiffs.  *Id.* ¶ 13.  On May 29, 2018, a criminal complaint was filed with the Western District of Texas, El Paso Division, charging Plaintiff W.P.V. with violation of 8 U.S.C. § 1325(a)(l).  *Id.* ¶ 18.  And on June 1, 2018, W.P.V. was convicted in the U.S. District Court for the Western District of Texas of violating 8 U.S.C. § 1325(a)(l).  *Id.* ¶ 19.

By contrast, the primary government conduct giving rise to the claims here is not alleged to have occurred anywhere in New York.  Rather, the gravamen of Plaintiffs' claims—namely, the detention and criminally prosecution of W.P.V. and the related separation of W.P.V. and W.P.O.— occurred in Texas, and the Complaint alleges no contact at all between Plaintiffs and the state of New York until *after* the separation occurred.  *See Larca v. United States*, No. 11 Civ. 3952 (JMF), 2012 WL 6720910, at *3 (S.D.N.Y. Dec. 16, 2012) (finding transfer warranted where misconduct allegedly occurred "primarily" in transferee venue); *see* Compl. ¶¶ 51-82.  This factor weighs heavily in favor of transfer.

### e.   **Availability of Compulsory Process.**

Federal Rule of Civil Procedure 45(c)(1)(a) provides that the power to subpoena witnesses for a deposition or trial extends only to "within 100 miles of where the person resides, is employed,

or regularly transacts business."  Fed. R. Civ. P. 45.  Accordingly, this Court cannot compel the presence of any necessary witness more than a hundred miles from the courthouse, and witnesses in Texas and New Mexico are beyond the subpoena power of this Court.  This could preclude the United States from calling any retired government employees as well as rebuttal witnesses at a trial to address the allegations related to the Otero County Processing Center in Chaparral, New Mexico and the Cibola County Correctional Center in Milan, New Mexico.  Those facilities are operated by contractors, CoreCivic and the Management and Training Corporation, and thus the guards and other personnel who operate them are primarily contractor employees—not government employees who could be directed to attend a trial here.  *See* Cervantes Decl. ¶¶ 7, 9, 11-12.  This weighs heavily in favor of transfer.

f.      **Means of the Parties.**

A party arguing against transfer because of inadequate means must offer documentation to show that transfer would be unduly burdensome on his finances.  *See It's a 10, Inc. v. PH Beauty Labs, Inc.*, 718 F. Supp. 2d 332, 338 (S.D.N.Y. 2010).  The government assumes that its means are greater than those of Plaintiffs, but Plaintiffs are represented by counsel who work at a firm with two offices in Texas,[4] and the Western District of Texas seems like a less expensive destination for Plaintiffs, based on their residences in Texas and Honduras, *see* Compl. ¶¶ 19-20, should their testimony be required.

g.      **The Forum's Familiarity with Governing Law.**

The claims asserted by Plaintiffs against the government sound in the common law of

---

[4] *See* Fish & Richardson website, with information regarding offices in Dallas, Texas and Houston, Texas,  https://www.fr.com/offices/.

Texas, where the separation occurred.[5]  The Western District of Texas routinely applies Texas tort law in FTCA and diversity cases.  Were those the only claims in this action, this factor would weigh in favor of transfer.  *See Jones v. United States*, No. 02 Civ. 1017 (JG), 2002 WL 2003191, at *4 (E.D.N.Y. Aug. 26, 2002) (finding this factor weighed in favor of transfer because "[a] federal district court sitting in Georgia would certainly be more familiar with Georgia law than a district court sitting in New York").  However, because New York law governs the claims against Cayuga Centers, this factor is neutral.

> h.    **Plaintiffs Choice of Forum Should be Afforded Diminished Weight.**

While Plaintiffs' forum choice is entitled to deference, such deference "decreases where the operative facts upon which the litigation is brought bear little material connection to the chosen forum."  *Kaufman*, 2021 WL 2269552, at *4 (internal quotation marks omitted).  Given the locus of operative facts in this action, and particularly the location of the alleged government wrongdoing, Plaintiffs' choice of forum for its claims is entitled to diminished weight.

> i.    **Trial Efficiency and the Interests of Justice Favor Transfer.**

Transfer of this action or, in the alternative, severance and transfer of the claims against the government would promote trial efficiency and would be in the interest of justice, especially because this case is in the early stages of litigation.  *See Frame v. Whole Foods Mkt., Inc.,* No. 06 Civ. 7058 (DAB), 2007 WL 2815613, at *7 (S.D.N.Y. Sept. 24, 2007) ("[W]ith regard to judicial economy and the interests of justice . . . transferring this case to the Western District of Texas would not cause any prejudice to Plaintiff" because "the case is at its earliest stages").  The interests

---

[5] Plaintiffs' remaining claims are asserted solely against Cayuga Centers and relate to Cayuga Centers' conduct while WPO was in its care and custody.  Those claims would be decided under New York law.

of justice are best served by transferring this action to the district where the primary conduct giving rise to the claims allegedly occurred and related witnesses are located.  *See Ruiz*, 2014 WL 4662241, at *11-14 (transferring FTCA case to Eastern District of Virginia where, *inter alia*, none of the Government's potential witnesses resided in the Eastern District of New York, and only two potential witnesses did); *Larca*, 2012 WL 6720910, at *3 (transferring FTCA case to the Northern District of Ohio because, *inter alia*, "virtually all of the witnesses, documents, and events critical to the litigation are in Ohio and were in Ohio at the time of the" events at issue); *Jones*, 2002 WL 2003191, at *2-4 (transferring FTCA case to the Southern District of Georgia where, *inter alia*, nine out of ten government witnesses resided in transfer forum state or adjacent states, alleged events occurred in state of transfer forum, and tort law of state of transfer forum applied).

## V.     <u>CONCLUSION</u>

For the foregoing reasons, this action should be transferred to the Western District of Texas or, in the alternative, the claims against the United States should be severed and transferred to the Western District of Texas.

19

Dated:   New York, New York
         June 22, 2022

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney for the
                              Southern District of New York
                              *Attorney for Defendant United States*

                              By: */s/ Rebecca Friedman*
                              REBECCA R. FRIEDMAN
                              MOLLIE KORNREICH
                              Assistant United States Attorneys
                              86 Chambers Street, 3rd Floor
                              New York, New York 10007
                              Tel: (212) 637-2614 / 3274
                              Fax: (212) 637-2686
                              rebecca.friedman@usdoj.gov
                              mollie.kornreich@usdoj.gov