```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
W.P.V., et al.,                                                  :
                                                                 :
                                    Plaintiffs,                  :
                                                                 :    21 Civ. 4436 (JPC)
              -v-                                                :
                                                                 :    OPINION AND
                                                                 :       ORDER
UNITED STATES OF AMERICA,                                        :
                                                                 :
                                    Defendant.                   :
                                                                 :
-----------------------------------------------------------------X
```

JOHN P. CRONAN, United States District Judge:

Plaintiffs W.P.V. and W.P.O., a father and son, bring this action against the United States (the "Government") under the Federal Tort Claims Act ("FTCA") for harm sustained from their forcible separation and detention following their illegal entry into the United States. Dkt. 4 ("Compl."). Plaintiffs allege that they were separated by law enforcement after being detained at the El Paso border, that W.P.V. was criminally prosecuted in the Western District of Texas and subsequently deported, and that W.P.O. was detained in El Paso before his transfer to Cayuga Home for Children, Inc. ("Cayuga Centers"), a Government-funded shelter in the Bronx where he resided for about a month before being released to his family.[1] Before the Court is the Government's motion to transfer this case to the Western District of Texas. Dkts. 66-70. The Government argues that the primary events giving rise to Plaintiffs' claims against it—*i.e.*, Plaintiffs' entry into the United States, their detention following entry, the subsequent separation,

---

[1] As discussed *infra*, Plaintiffs also sued Cayuga Centers in this action. *See* Compl. ¶¶ 27-28. Plaintiffs have since settled with Cayuga Centers, and the Court terminated Cayuga Centers as a Defendant on January 16, 2023. Dkt. 90.

and W.P.V.'s confinement and criminal prosecution—occurred in Texas, and that most of the witnesses, including W.P.O., currently reside in Texas. Dkt. 67 ("Motion") at 1-2. Plaintiffs oppose, asking the Court to defer to their choice of forum and citing W.P.O.'s confinement at Cayuga Centers in the Bronx. For the reasons discussed, the motion is granted and the case is transferred to the Western District of Texas.

## I. Background

**A.  Facts**

In April 2018, W.P.V. and his then four-year-old son W.P.O. began traveling from Honduras to the United States with the intent to seek asylum. Compl. ¶¶ 46-47. On or about May 2018, Plaintiffs crossed the border into the United States near El Paso, Texas. *Id.* ¶¶ 51-52. Plaintiffs were soon apprehended on the north bank of the Rio Grande River by law enforcement agents with U.S. Customs and Border Protection assigned to the El Paso Border Patrol Station. Dkt. 68 ("Garcia Decl.") ¶ 9; *see* Compl. ¶ 52 (alleging that, upon crossing the border, W.P.V. and W.P.O. approached officers to surrender). While still on the bank of the Rio Grande River, W.P.V. admitted to law enforcement that he and W.P.O. had unlawfully entered into the United States, without documents allowing their lawful presence. Garcia Decl. ¶ 10. Plaintiffs were then transported to a processing center in El Paso where W.P.V. was processed for expedited removal. *Id.* ¶¶ 11-12; *see also* Compl. ¶ 55. Plaintiffs allege that they were severely mistreated by federal officials during these initial interactions, including by being called derogatory names and with W.P.O. being denied medical attention. Compl. ¶¶ 53-58.

After a short interview at the El Paso processing station, Plaintiffs claim that they were placed in what is colloquially referred to as a "*hielera*" or "icebox" "because of its very cold temperatures, lack of windows and natural light, and all-hard surfaces." *Id.* ¶ 59; *accord id.* ¶ 57.

While in the *hielera*, Plaintiffs allege that they were denied access to water and clean diapers for W.P.O. *Id.* ¶¶ 62-63. After spending three hours in the *hielera*, officers allegedly removed W.P.V., separating him from W.P.O. *Id.* ¶¶ 66-67. Plaintiffs contend that the purpose of the separation was "to torment and traumatize the family, and to coerce W.P.V. to give up any claims for relief and accept deportation." *Id.* ¶ 68.

On May 24, 2018, the U.S. Attorney's Office for the Western District of Texas approved the criminal prosecution of W.P.V. for entry into the United States without inspection in violation of 8 U.S.C. § 1325(a)(1). Garcia Decl. ¶ 13. The next day, W.P.V. was transferred to the custody of the United States Marshals Service for detention at the El Paso County Detention Facility because of the pending federal prosecution. *Id.* ¶ 17. W.P.V. was charged in a criminal complaint filed on May 29, 2018 with violating 8 U.S.C. § 1325(a)(1), and he was convicted of that offense on June 1, 2018. *Id.* ¶¶ 18-19. He remained at the El Paso County Detention Facility until being transferred into Immigration and Customs Enforcement ("ICE") custody on June 4, 2018. *Id.* ¶ 19. After briefly returning to the El Paso processing center, W.P.V. was transferred to the Cibola County Correctional Center in Milan, New Mexico on June 5, 2018. Dkt. 70 ("Cervantes Decl.") ¶¶ 6-7. W.P.V. was sent back to the El Paso processing center on June 25, 2018, and then transferred to the Otero County Processing Center in Chaparral, New Mexico, the following day, where he remained until his removal to Honduras on July 11, 2018. *Id.* ¶¶ 8-9. As of the filing the Complaint, W.P.V. continued to reside in Honduras. Compl. ¶ 20.

Meanwhile, upon being separated from his father, W.P.O. was transferred from the El Paso processing station to the Border Patrol Station in Clint, Texas on May 25, 2018, where he remained until the following day. Garcia Decl. ¶ 15. Based on the U.S. Attorney's Office's decision to prosecute W.P.V., W.P.O. was processed as an unaccompanied child and placed in the custody of

3

the Office of Refugee Resettlement ("ORR"). *Id.* ¶ 16; Dkt. 69 ("De La Cruz Decl.") ¶ 4. W.P.O. was then transferred to Cayuga Centers in the Bronx, New York, where he stayed for the remainder of his time in ORR custody. De La Cruz Decl. ¶ 4. Cayuga Centers receives funding from ORR to "[p]rovide[] care and shelter for [unaccompanied children] in a foster care setting while attempting to identify a sponsor to care for the child." *Id.* Plaintiffs, however, allege that "Cayuga Centers was not able to provide adequate facilities" for W.P.O. and, more specifically, "failed to take account of the trauma WPO experienced fleeing Honduras and being separated from his father and instead exacerbated it." Compl. ¶ 90. On or about July 1, 2018, W.P.O. was released from Cayuga Centers to his aunt who lives in Texas. De La Cruz Decl. ¶ 5; *see* Compl. ¶ 96 (alleging that W.P.O. was discharged from Cayuga Centers on June 29, 2018). As of the filing of the Complaint, W.P.O. resided in Dallas, Texas. Compl. ¶ 19.

**B.     Procedural History**

After exhausting their various administrative remedies, *id.* ¶¶ 12-13, Plaintiffs filed their Complaint against the Government and Cayuga Centers on May 17, 2021. Dkt. 1. Plaintiffs bring two causes of action against the Government pursuant to the FTCA: (1) intentional infliction of emotional distress based on the conduct of federal officers and officials, Compl. ¶¶ 133-36; and (2) negligence, again based on the conduct of federal officers, *id.* ¶¶ 137-41. Plaintiffs' FTCA claims against the Government center on its application of the so-called "family separation policy" against them: "The government's family separation policy was cruel and inhuman, and it is unlawful. The United States is liable for the conduct which harmed Plaintiffs under the [FTCA]." *Id.* ¶ 9; *see id.* ¶¶ 29-44 (extensive discussion of the "family separation policy"), 68 ("The purpose of separating WPO from WPV and isolating him from any family, was to torment and traumatize the family, and to coerce WPV to give up any claims for relief and accept deportation. The torment

4

and trauma were inflicted deliberately because of their race and national origin."). Plaintiffs further allege that the Government's forcible separation of W.P.V. and W.P.O. and its failure to reunify them was part of a pattern and practice of intentional mistreatment of similarly situated asylum seekers. *Id.* ¶¶ 102-32; *see, e.g.*, ¶ 102 ("The Government's treatment of WPO and WPV is a part of the Government's plan to punish asylum seekers. CBP officers generally carried out separations of parents and children under the family separation policy at various immigration detention sites near the southwestern border, including the site where officers held and separated WPO and WPV after they entered the United States."). Plaintiffs also brought claims against Cayuga Centers for negligence, for breach of fiduciary duty, and under the Rehabilitation Act, 29 U.S.C. § 794, 41 U.S.C. § 12102(1), primarily based on W.P.O.'s treatment while in Cayuga Centers' care. Compl. ¶¶ 142-63.

On July 22, 2021, the Court granted the parties' request to stay the case while the parties attempted to negotiate a settlement. Dkt. 21. That stay was continued through March 11, 2022. *See* Dkts. 28, 31, 35, 46, 48, 50. On May 9, 2022, the Government sought leave to move to transfer this action to the Western District of Texas. Dkt. 56. After the Court granted the Government leave, Dkt. 62, the Government filed its motion on June 22, 2022, Dkts. 66-70, Plaintiffs filed an opposition brief on July 22, 2022, Dkt. 72 ("Opposition"), and the Government replied on August 5, 2022, Dkt. 75.

Meanwhile, on July 22, 2022, Cayuga Centers informed the Court that it had reached a settlement in principle with Plaintiffs and declined to make any submissions in response to the Government's motion to transfer venue. Dkt. 71. On January 13, 2023, after finalizing a settlement agreement, Plaintiffs and Cayuga Centers jointly moved pursuant to Local Civil Rule 83.2(a) and sections 1207 and 1208 of the New York Civil Practice Law and Rules to settle claims

on behalf of W.P.O.—a minor. Dkts. 88-89. The Court granted the motion on January 17, 2023 and terminated Cayuga Centers as a defendant in this case. Dkt. 90. Accordingly, only Plaintiffs' claims against the Government remain.

## II. Legal Standard

Title 28, United States Code, Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Courts apply a two-part test to determine whether to grant a motion to transfer venue. First, as a threshold inquiry, the court must decide whether "the transferee district" is "one where jurisdiction over the defendant could have been obtained at the time suit was brought, regardless of defendant's consent." *Sentegra, LLC v. ASUS Computer Int'l*, No. 15 Civ. 3768 (GHW), 2016 WL 3093988, at *2 (S.D.N.Y. June 1, 2016).

Once that requirement is established, courts turn to the question of "whether transfer is appropriate." *Burgos v. United States*, No. 16 Civ. 7091 (RA), 2017 WL 2799172, at *2 (S.D.N.Y. June 27, 2017) (quoting *Freeplay Music, LLC v. Gibson Brands, Inc.*, 195 F. Supp. 3d 613, 616 (S.D.N.Y. 2016)). The inquiry considers whether the transfer is "in the interest of justice and convenience of the parties and witnesses," and courts are often guided by nine factors:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*Sentegra, LLC*, 2016 WL 3093988, at *2 (citations omitted). The moving party must demonstrate that these factors militate toward transfer by clear and convincing evidence. *See N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 113-14 (2d Cir. 2010).

6

### III.  Discussion

There is no real dispute that the first prong of the section 1404(a) analysis—whether venue is proper in the transferee district—is satisfied.  Under the FTCA, the Government can be sued in any judicial district "where the plaintiff resides or wherein the act or omission complained of occurred."  28 U.S.C. § 1402(b).  Here, Plaintiffs could have filed their lawsuit in the Western District of Texas, which encompasses El Paso—where Plaintiffs crossed the U.S. border, and where Plaintiffs were arrested and detained.  *See generally* Garcia Decl.  It is also the district where W.P.V. was criminally prosecuted for entry without inspection, *see id.* ¶¶ 13, 17-19, and, most notably, where the initial act of separating W.P.V. from W.P.O. occurred, Compl. ¶¶ 66-67.  *See Barry v. United States*, No. 21 Civ. 7684 (BCM), 2022 WL 4467504, at *5 (S.D.N.Y. Sept. 26, 2022) ("The first prong of the two-party inquiry is clear-cut. . . .  [P]laintiff could have filed this lawsuit in the Southern District of Texas, which is where he presented himself when he crossed the U.S. border and where he was detained, for four months, at the [ICE detention facility].").  Thus, the Court turns to analyzing the nine factors guiding the second prong: "whether transfer is appropriate."  *Burgos*, 2017 WL 2799172, at *2.

**A.     Convenience of the Witnesses**

Plaintiffs and the Government agree that "[t]he convenience of both party and nonparty witnesses is probably considered the single most important factor in the analysis of whether a transfer should be granted."  *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 197 (S.D.N.Y. 2000) (internal quotation marks omitted); *accord* Motion at 12; Opposition at 13.  "Because the 'core' inquiry under § 1404(a) is where the 'center of gravity of the litigation' is located, courts 'routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district.'"  *Ruiz ex rel. E.R. v. United States*, No. 13 Civ. 1241 (KAM) (SMG),

2014 WL 4662241, at *11 (E.D.N.Y. Sept. 18, 2014) (quoting *Viacom Int'l, Inc. v. Melvin Simon Prods., Inc.*, 774 F. Supp. 858, 868 (S.D.N.Y. 1991)). "When weighing the convenience of the witnesses, courts must consider the materiality, nature, and quality of each witness, not merely the number of witnesses in each district." *Freeplay Music, LLC*, 195 F. Supp. 3d at 617 (internal quotation marks omitted).

Here, the Government contends that likely witnesses at any trial would include the "Border Patrol agents and supervisors who were involved in the apprehension and processing of Plaintiffs while they were in the custody of U.S. Border Patrol, including the criminal prosecution of W.P.V.," and that these witnesses "are presently almost exclusively located in Texas and New Mexico." Garcia Decl. ¶ 20; *see* Motion at 12 ("Based on the government's preliminary assessment of the claims against it, the critical witnesses who have knowledge of the facts regarding the government's allegedly tortious conduct are located in or close to the Western District of Texas, with the exception of [W.P.V.], who alleges that he resides in Honduras." (citing Compl. ¶ 20)). In particular, the Government has identified nine Border Patrol agents who participated in Plaintiffs' initial apprehension and processing. Of those nine, one agent is currently assigned to the Santa Teresa station in New Mexico, five agents are currently assigned to the El Paso Station, two have recently retired and appear to be residing in Texas, and one agent is currently assigned to San Diego, California. Garcia Decl. ¶ 20; Motion at 12-13. Thus, it appears that a majority of the Border Patrol witnesses reside within the Western District of Texas itself, with the remaining residing either in other parts of Texas or elsewhere in the western United States, which are far closer to the Western District of Texas than to the Southern District of New York. In addition, W.P.O. (in the event he would be a witness) appears to be in Texas, Compl. ¶ 19, and W.P.V. appears to be in Honduras, *id.* ¶ 20.

Plaintiffs argue that this factor still counsels against transfer because "witnesses are located at the Cayuga Centers in New York [who] . . . can speak to the circumstances surrounding W.P.O.'s transfer to and arrival at the Cayuga Centers," as well as his "physical and mental condition" upon his arrival and during his time there. Opposition at 13. Plaintiffs also assert that U.S. Government "employees are presumed to be available in any venue, including the Southern District of New York." *Id.* But Plaintiffs have not pointed to any specific individuals at Cayuga Centers that they expect to be witnesses, and W.P.O. (in the event he could be a witness to events at the Cayuga Centers) lives in Texas. Moreover, while Plaintiffs are correct that "government employees are [generally] considered available for litigation in any venue in the country," this presumption carries less weight in the context of the section 1404(a) analysis where, as here, "none of the [Government employee witnesses] with personal knowledge of the relevant facts is an individual defendant in this action," *Barry*, 2022 WL 4467504, at *6, most of them live and work in Texas, and none reside in the Southern District of New York nor routinely travel to this District for work, *Ruiz*, 2014 WL 4662241, at *11.[2] *See also Burgos*, 2017 WL 2799172, at *2 (granting the Government's motion to transfer in part because of the twelve individuals identified as potential witnesses for the Government, "ten are in New Jersey, and none are in the Southern District of New York"); *Larca v. United States*, No. 11 Civ. 3952 (JMF), 2012 WL 6720910, at *3 (S.D.N.Y. Dec. 16, 2012) (transferring case to the Northern District of Ohio because "[m]ost significantly,

---

[2] Plaintiffs attempt to distinguish *Ruiz* on this factor because "the present case involves events arising both in Texas and New York" whereas in *Ruiz*, "all events relating to the underlying cause of action happened in [the transferee district]." Opposition at 14. But this confuses the "convenience of witnesses" and the "locus of operative facts" factors. And even if not, as discussed at *infra* III.D, now that Cayuga Centers has settled, the remaining claims against the Government almost entirely stem from the Government's initial treatment of Plaintiffs immediately upon entering the country, including the act of separating W.P.V. from W.P.O., all of which occurred in the Western District of Texas.

9

virtually all of the witnesses . . . critical to the litigation are in Ohio and were in Ohio at the time of the alleged" harm); *Jones v. United States*, No. 02 Civ. 1017 (JG), 2002 WL 2003191, at *2 (E.D.N.Y. Aug. 26, 2002) (similar). As such, this first factor favors transfer.

**B.  Convenience of the Parties**

"A defendant moving for transfer must show both that the original forum is inconvenient for it and that the plaintiff would not be substantially inconvenienced by a transfer." *Flood v. Carlson Rests., Inc.*, 94 F. Supp. 3d 572, 578 (S.D.N.Y. 2015) (internal quotation marks omitted). As discussed below, *see infra* III.D, following Plaintiffs' settlement with Cayuga Centers, the remaining claims primarily involve alleged wrongdoing by federal officials that occurred in Texas. It therefore would be more convenient for the Government to litigate in the Western District of Texas, as the location where the alleged tortious conduct occurred and closer proximity to where critical witnesses are located. Motion at 14; *see Barry*, 2022 WL 4467504, at *5. Moreover, transfer would not cause substantial inconvenience to either Plaintiff since W.P.O. appears to live in Texas, and W.P.V. appears to live in Honduras, which would require significant travel to either venue but is closer to Texas than New York. And any argument that transfer would be less convenient for Cayuga Centers is now moot given that Plaintiffs and Cayuga have settled. Accordingly, this factor weighs in favor of transfer.

**C.  Location of Relevant Documents**

"[C]ourts have recognized that the location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents . . . ." *Monfried v. Sigma Fin. Corp.*, No. 15 Civ. 2806 (VSB), 2016 WL 9724977, at *4 (S.D.N.Y. June 14, 2016) (internal quotation marks, brackets, and citations omitted)); *Barry*, 2022 WL 4467504, at *6. Neither party has pointed to any specific document or piece of evidence (apart from Plaintiffs' assertions that

10

Cayuga Centers generally possesses evidence relevant to the litigation) in either the Southern District of New York or the Western District of Texas. This factor is therefore neutral.

**D.    Locus of Operative Facts**

"The location of the operative events is a primary factor in determining a § 1404(a) motion to transfer," *Alpha Indus., Inc. v. Alpha Clothing Co.*, 21 Civ. 87 (KPF), 2021 WL 2688722, at *6 (S.D.N.Y. June 30, 2021) (internal quotation marks omitted), because "transfer to a district where the key operative events occurred serves the interests of justice," *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 745 (S.D.N.Y. 2013) (internal quotation marks omitted). "To determine where the locus of operative facts lies, courts look to the site of events from which the claim arises." *Guccione v. Harrah's Mktg. Servs. Corp.*, No. 06 Civ. 4361 (PKL), 2009 WL 2337995, at *8 (S.D.N.Y. July 29, 2009) (internal quotation marks omitted).

Plaintiffs allege that the Government violated the FTCA by applying the "family separation policy" to them after their arrival in Texas and on account of the conditions of their detention in Texas. *E.g.*, Compl. ¶¶ 9 ("The government's family separation policy was cruel and inhuman, and it is unlawful. The United States is liable for the conduct which harmed Plaintiffs under the [FTCA]."); 45 (alleging that "upon entering the United States, [Plaintiffs] were taken into custody, placed in an overcrowded and unsanitary detention facility, and then cruelly separated"); 53, 55 (alleging that officials in Texas referred to W.P.V. using derogatory phrases and exhibited racist behavior); 56, 58, 59-62 (alleging that officials in Texas placed Plaintiffs in a *hielera* in cold conditions and without access to water); 63-65, 66-67 (alleging that W.P.V. was separated from his son while they were at the *hielera* in Texas); 68 (alleging that "[t]he purpose of separating WPO from WPV and isolating him from any family, was to torment and traumatize the family,

11

and to coerce WPV to give up any claims for relief and accept deportation," and that "[t]he torment and trauma were inflicted deliberately because of their race and national origin"); 73 (alleging that officials in Texas delayed attending to or ignored W.P.O.'s medical needs); 82 (alleging that W.P.O. remained at the *hielera* after his father was removed, before being transferred to Cayuga Centers the following day); 102-32 (alleging that the Government's separation of W.P.V. and W.P.O. was part of a pattern and practice of intentional mistreatment of similarly situated asylum seekers at "various immigration detention sites near the southwest border"). These allegations involve acts occurring in Western District of Texas. *See Jones*, 2002 WL 2003191, at *3 ("In this case, all of the legally operative events took place within the Southern District of Georgia.").

Thus, the operative events that involve the Government and trigger its potential liability under the FTCA predominantly, if not entirely, occurred in the Western District of Texas. Plaintiffs crossed the border into Texas near El Paso, were soon detained (and allegedly harassed) by law enforcement on the north bank of the Rio Grande, and were initially processed and allegedly placed in the *hielera* at the El Paso processing center. *See* Compl. ¶¶ 51-67; Garcia Decl. ¶¶ 9-11. All these events occurred in the Western District of Texas. And most significantly given Plaintiffs' claims against the Government, the Western District of Texas also is where the initial act of father-son separation occurred, as W.P.V. allegedly was separated from W.P.O. while at the El Paso processing center. Garcia Decl. ¶¶ 13-14, 16; *see Barry*, 2022 WL 4467504, at *5 (concluding that the locus of operative fact was in the Southern District of Texas where the "plaintiff crossed the border and was detained"); *Ruiz*, 2014 WL 4662241, at *12 (concluding that the locus of operative fact was in Virginia since the plaintiff's detention by Customs and Border Protection officers—the primary acts giving rise to the litigation—occurred at Dulles Airport).

Plaintiffs assert that the Court should also attribute Cayuga Centers' conduct in the Bronx to the Government since the Government specifically targeted Cayuga Centers when they could have sent W.P.O. to a facility in Texas, and because "[t]he Government had sole authority to decide when to end W.P.O.'s custody at Cayuga Centers." Opposition at 8-9. This argument is less persuasive following Plaintiffs' recent settlement with Cayuga Centers, which left the Government as the lone remaining Defendant. Dkt. 90. Even if the Complaint could be read as alleging some form of vicarious liability against the Government for conditions at Cayuga Centers, this would only be a small portion of Plaintiffs' claims against the Government. As noted, the majority of Plaintiffs' allegations against the Government concern conduct in the Western District of Texas that occurred shortly after their initial entry into the United States, including their detention at the El Paso processing center, their separation while at that center, W.P.V.'s prosecution in the Western District of Texas, and W.P.O.'s continued detention in Texas until he was transferred to Cayuga Centers. And Plaintiffs do not even allege that the Government's decision to transfer W.P.O. to Cayuga Centers was made in New York. Accordingly, this factor favors transfer.

E.      **Availability of Process to Compel Attendance of Unwilling Witnesses**

This factor "requires a consideration of the court's power to compel attendance of unwilling witnesses, as a district court only can subpoena witnesses within the district or within 100 miles of the [court]." *Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 375 (S.D.N.Y. 2006); *accord* Fed. R. Civ. P. 45(c)(1)(A) ("A subpoena may command a person to attend trial, hearing or deposition only . . . within 100 miles of where the person resides, is employed, or regularly transacts business in person."). However, this factor is "generally relevant only with respect to third-party witnesses, because employee witnesses are subject to compulsory

process in either forum by virtue of their employment relationship with a party." *Ruiz*, 2014 WL 4662241, at *11 (internal quotation marks omitted).

The Government asserts that this 100-mile limitation "could preclude [it] from calling any retired government employees as well as rebuttal witnesses . . . to address the allegations related to the Otero County Processing Center . . . and the Cibola County Correctional Center," Motion at 17, which are locations where W.P.V. was detained following his illegal entry conviction and are operated by independent contractors, Cervantes Decl. ¶¶ 7, 9.  On the other hand, if the case were transferred to the Western District of Texas, the same would be true of any witnesses from Cayuga Centers, which is no longer a party and operates in New York.  Ultimately, given that this factor appears to point in both directions, and in the absence of affidavits or other evidence suggesting that any prospective non-party witnesses would not appear in either district, this factor is neutral. *See, e.g.*, *Barry*, 2022 WL 4467504, at *7; *Ruiz*, 2014 WL 4662241, at *11-12; *Martignago v. Merrill Lynch & Co.*, No. 11 Civ. 3923 (PGG), 2012 WL 112246, at *8 (S.D.N.Y. Jan. 12, 2012).

**F.     Relative Means of the Parties**

"Where a disparity exists between the means of the parties, a court may consider the relative means of the parties in determining venue."  *Aerotel, Ltd.*, 100 F. Supp. 2d at 197. However, "a party arguing for or against a transfer because of inadequate means must offer documentation to show that transfer (or lack thereof) would be unduly burdensome to his finances."  *It's a 10, Inc. v. PH Beauty Labs, Inc.*, 718 F. Supp. 2d 332, 338 (S.D.N.Y. 2010) (internal quotation marks and brackets omitted).

Normally, the Government's means would be presumed to be greater than a plaintiff's. *See, e.g.*, *Barry*, 2022 WL 4467504, at *6; *Ruiz*, 2014 WL 4662241, at *13; *Jones*, 2002 WL 2003191, at *3.  That said, "plaintiff is represented by *pro bono* counsel from a large and well-

14

resourced law firm," *Barry*, 2022 WL 4467504, at *6, Fish and Richardson, which has two offices in Texas, *see Offices*, Fish & Richardson, https://www.fr.com/offices/ (last visited Feb. 13, 2023). Moreover, Plaintiffs "are not arguing against transfer based on inadequate means or their allegedly more limited means, relative to those of the Government." Opposition at 17. This factor is therefore neutral.

G.  **Forum's Familiarity with the Governing Law**

"Under the FTCA, a district court applies 'the law of the place where the act or omission occurred.'" *Ruiz*, 2014 WL 4662241, at *13 (quoting 28 U.S.C. § 1346(b)). Now that Plaintiffs have settled with Cayuga Centers, a court would most likely apply Texas tort law to Plaintiffs' claims against the Government concerning their initial apprehension, detention, and separation—all of which occurred in Texas. While "[t]his Court is of course capable of applying Texas law[, n]onetheless, this factor weighs slightly in favor of transfer, as the [Western] District of Texas would be 'more familiar' with local law and potentially, for that reason, more efficient." *Barry*, 2022 WL 4467504, at *7; *see also Jones*, 2002 WL 2003191, at *4 ("A federal district court sitting in Georgia would certainly be more familiar with Georgia law than a district court sitting in New York.").

H.  **Weight Accorded to Plaintiff's Choice of Forum**

Plaintiffs are correct that their "choice of forum is generally entitled to deference." *Am. Eagle Outfitters, Inc. v. Tala Bros. Corp.*, 457 F. Supp. 2d 474, 479 (S.D.N.Y. 2006). That deference, however "'is significantly diminished' where, as here, 'the operative facts have no connection to the chosen district.'" *Larca*, 2012 WL 6720910, at *3 (quoting *Carder v. D & D Jewelry Imports*, 510 F. Supp. 2d 344, 346 (S.D.N.Y. 2007)); *see also Ruiz*, 2014 WL 4662241, at *10. Moreover, "many courts accord this factor less weight in the transfer context than in a *forum*

15

*non conveniens* motion, since a transfer motion does not seek dismissal of the complaint." *Jones*, 2002 WL 2003191, at *3. Thus, "district courts should locate the degree of deference to be afforded a plaintiff's forum choice on a sliding scale." *Maverick Fund, L.D.C. v. Lender Processing Servs., Inc.*, No. 13 Civ. 5474 (DLC), 2013 WL 6467889, at *2 (S.D.N.Y. Dec. 10, 2013) (internal quotation marks omitted).

Here, the factors warranting transfer to the Western District of Texas are extremely compelling. Now that Cayuga Centers has settled, the case primarily involves tortious conduct that occurred exclusively in Texas; many of the witnesses, including one of the Plaintiffs (in the event he is a witness), reside in Texas; Texas law will almost certainly apply to the remaining claims; and Plaintiff has sophisticated *pro bono* counsel with offices in Texas. Accordingly, the Court finds that Plaintiff's choice of forum is entitled to diminished weight. *See Barry*, 2022 WL 4467504, at *7.

### I.     Trial Efficiency and the Interests of Justice

While this case has been pending for almost two years, it is still in early stages, in part because it has been stayed from July 22, 2021 through March 11, 2022 pending settlement discussions. Dkts. 21, 28, 35, 46, 48, 50. No formal discovery has occurred, and the only remaining defendant—the Government—has yet to respond to the Complaint. Dkt. 62 (adjourning deadline for the Government to respond to the Complaint to one week after the Court decides its motion to transfer venue); *see Frame v. Whole Foods Mkt.*, No 06 Civ. 7058 (DAB), 2007 WL 2815613, at *7 (S.D.N.Y. Sept. 7, 2007); *see also Barry*, 2022 WL 4467504, at *8. This factor is therefore neutral.

* * *

In sum, all of the factors either favor transfer or are neutral, with the two primary factors—the convenience of the witnesses and the locus of operative facts—favoring transfer and with Plaintiff's choice of forum entitled to diminished deference in this case.  As such, the Court finds that transfer to the Western District of Texas is appropriate.

### IV.  Conclusion

For the foregoing reasons, the Government's motion to transfer this case to the Western District of Texas is granted.  The Clerk of Court is respectfully directed to close Docket Number 66 and to transfer this case to the Western District of Texas.

SO ORDERED.

Dated: February 14, 2023  
      New York, New York

                                                 JOHN P. CRONAN  
                                           United States District Judge